[No. B029169. Second Dist., Div. Seven. Dec. 21, 1988.]

JULIA ASHWORTH et al., Plaintiffs and Appellants, v.
MEMORIAL HOSPITAL OF LONG BEACH et al., Defendants and
Respondents.

COUNSEL

James A. Marcinkus and Robert L. Driskell for Plaintiffs and Appellants.

Bonne, Jones, Bridges, Mueller, O'Keefe & Hunt, Lori S. Lippman, Morgan, Wenzel & McNicholas, Nancy J. Bennett, David T. McCann, Greines, Martin, Stein & Richland, Martin Stein and Timothy T. Coates for Defendants and Respondents.

## OPINION

**JOHNSON, J.—** ▬ In this opinion we hold the statutory "foreign body exception" delays the start of the medical malpractice statute of limitations (Code Civ. Proc., § 340.5) until the patient discovers or through reasonable diligence would have discovered the "foreign body" itself and its role as the negligent cause of her suffering. ▬ We further hold this tolling continues even though the plaintiff has filed an earlier action based on other forms of malpractice occurring during the same medical treatment where this earlier action has been dismissed without prejudice.

### STATEMENT OF FACTS AND PROCEEDINGS BELOW

In January of 1976 appellant Julia Ashworth (Mrs. Ashworth) experienced severe pains in her right side. She went to respondent Memorial Hospital of Long Beach (Hospital) and was referred to a urologist, Dr. John W. Barloon. Dr. Barloon diagnosed the cause of Mrs. Ashworth's pain as kidney stones. On February 11, 1976, Dr. Barloon operated to remove these stones from her left kidney. He was assisted in this surgery by respondent Dr. Richard Carlisle (Dr. Carlisle), who was his associate.

By mid-March 1976, Mrs. Ashworth was experiencing severe pain on her right side again. She went to the hospital's emergency room. Since Dr. Barloon was not available Dr. Carlisle operated again for kidney stones. There were problems during surgery, however. Dr. Carlisle severed the vein leading from Mrs. Ashworth's right kidney and could not repair it. As a result, he was compelled to remove this kidney.

In the late spring and early summer of 1976, Mrs. Ashworth discovered she had an abscess in her left side. This abscess drained an odorous pus which eventually had to be drained on almost a daily basis. Dr. Barloon advised Mrs. Ashworth the abscess was a usual risk of surgery. In August of 1976 Dr. Barloon attempted to cure this further complication by exploring the abscess with instruments and irrigating it with a fluid of antibiotics. This procedure failed to solve the problem. In November of 1976 Dr. Barloon attempted to excise the abscess and clean up the source of infection. After this operation Mrs. Ashworth developed high fevers. Dr. Carlisle prescribed antibiotics which unfortunately triggered an allergic reac-

tion which destroyed the patient's auditory nerve and caused nearly total deafness. In December 1976 Mrs. Ashworth finally removed herself from the care of Drs. Barloon and Carlisle.

In November 1977 Mrs. Ashworth and her husband, appellant Bill Ashworth, filed a lawsuit in propria persona for medical malpractice and loss of spousal consortium against respondents and Dr. Barloon. The medical malpractice count of this complaint alleged in pertinent part: "8. That on or about November 9, 1976, and prior thereto, and thereafter, plaintiff JULIA ASHWORTH, consulted and engaged for compensation, the services of defendants JOHN W. BARLOON, M.D., RICHARD CARLISLE, M.D., LONG BEACH MEMORIAL HOSPITAL, UROLOGICAL GROUP OF LONG BEACH, and DOES 1 through 30, inclusive, to examine, diagnose, prescribe medicines and drugs and to care for and treat a problem involving her well-being and to perform the necessary surgery in the treatment of this problem, if the same were required.

"9. That on or about November 9, 1976, and prior thereto, and thereafter, defendants JOHN W. BARLOON, M.D., RICHARD CARLISLE, M.D., LONG BEACH MEMORIAL HOSPITAL, UROLOGICAL GROUP OF LONG BEACH, and DOES i [sic] to 30, inclusive, and each of them, undertook to examine, diagnose, prescribe medicines and drugs, handle and control the care and treatment of plaintiff, and to perform surgery on plaintiff for her problem.

"10. That in the aforesaid examination and diagnosis of plaintiff, the prescription of medicines and drugs, the handling and control of the care and treatment of plaintiff, and the performance of surgery on plaintiff, defendants, and each of them, negligently failed to possess and to exercise that degree of knowledge and skill ordinarily possessed and exercised by other physicians and surgeons, hospitals, medical groups, nurses, attendants, and the like, engaged in said profession in the same or similar locality as the said defendants, and each of them.

"11. That as a direct and proximate result of the negligence and wrongful conduct of defendants . . . plaintiff, JULIA ASHWORTH, has sustained severe, serious, and permanent injuries to her person, all to her general damage in a sum within the jurisdiction of the Superior Court."

In late 1982 the Ashworths' initial lawsuit was dismissed for failure to prosecute pursuant to Code of Civil Procedure section 583.[1]

---

[1] All subsequent statutory citations refer to the Code of Civil Procedure unless indicated otherwise.

While this lawsuit was pending Mrs. Ashworth continued to suffer from the oozing wound in her left side. Finally on November 11, 1983, almost a year after the dismissal of the lawsuit, a Dr. Fred Kuyt operated on her. He discovered two foreign objects—described as "cotton pledgets" or "sponges"—near her left kidney and removed them. After this surgery Mrs. Ashworth no longer suffered from the draining abscess on her left side. Dr. Kuyt expressed an opinion "to a high degree of medical probability" that the foreign bodies adjacent to her kidney were a major causal factor in her infection. He further opined the failure to remove these objects constituted negligence.

On November 9, 1984, the Ashworths now represented by counsel filed the instant lawsuit. Once again they alleged medical malpractice and loss of spousal consortium against respondent Hospital and respondent Dr. Carlisle as well as Dr. Barloon and other defendants. This time, however, the complaint specifically cites the negligent failure to remove certain "foreign bodies" (so-called "cotton pledgets") as the act of malpractice which is the proximate cause of Mrs. Ashworth's injuries. On March 12, 1987, respondents and other defendants filed a summary judgment motion. The motion was heard on May 28, 1987. During this hearing the trial court expressly found there was a triable issue whether the "foreign bodies" had a therapeutic purpose and effect. Nonetheless, on June 12, 1987, the court issued a minute order granting summary judgment for respondents. The court held the dismissal of the first case "barred" the second case, evidently on grounds of res judicata or collateral estoppel. Judgment was entered on June 30, 1987, and appellants filed a timely appeal.

### DISCUSSION

Respondents concede the trial court erred when it grounded summary judgment on a finding the section 583 dismissal of the 1977 case "barred" the 1984 case. Section 583 dismissals are "without prejudice" (See discussion at pp. 1062-1063, *infra*) and thus have no res judicata or collateral estoppel effect. ■ Nonetheless, respondents argue the summary judgment should be sustained on appeal if there are other, valid grounds supporting this result. In this we agree. "It is the action of the lower court, not the reasons for its action, which we review. If right upon any theory of the law applicable to the case, a judgment will be sustained regardless of the considerations which may have moved the trial court to its conclusion." (*City of Alameda* v. *Premier Communications Network, Inc.* (1984) 156 Cal.App.3d 148, 157, fn. 9 [202 Cal.Rptr. 684].)

■ As their substitute grounds for this summary judgment, respondents argue the Ashworths' 1984 complaint was not timely filed. They

contend Mrs. Ashworth "discovered" her malpractice action no later than 1977. Thus, the statute of limitations expired on the medical malpractice cause of action in 1978. To assess this issue, we first inquire whether the statute of limitations would have run on the Ashworths' 1984 malpractice action had they not filed the 1977 lawsuit. ■ We then determine whether the act of filing the 1977 lawsuit started the statute running on the cause of action filed in 1984.

■ I. THE "FOREIGN BODY EXCEPTION" DELAYS THE START OF THE "DISCOVERY" LIMITATION PERIOD OF SECTION 340.5 UNTIL PLAINTIFF DISCOVERS OR THROUGH REASONABLE DILIGENCE WOULD HAVE DISCOVERED THE "FOREIGN BODY" AS THE NEGLIGENT CAUSE OF HER INJURIES DESPITE PLAINTIFF'S "SUSPICION" HER INJURIES WERE THE RESULT OF OTHER FORMS OF MALPRACTICE

A. *The "Foreign Body Exception" Before and After the Enactment of Section 340.5*

The statute of limitations for medical malpractice actions is defined in section 340.5. This section provides in pertinent part: "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first. In no event shall the time for commencement of legal action exceed three years unless tolled for any of the following: (1) upon proof of fraud, (2) intentional concealment, or (3) the presence of a foreign body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person."

■ Section 340.5 creates two separate statutes of limitations, both of which must be satisfied if a plaintiff is to timely file a medical malpractice action. First, the plaintiff must file within one year after she first "discovers" the injury *and the negligent cause* of that injury. Secondly, she must file within three years after she first experiences harm from the injury. This means that if a plaintiff does not "discover" the negligent cause of her injury until more than three years after she first experiences harm from the injury, she will not be able to bring a malpractice action against the medical practitioner or hospital whose malpractice caused her injury. (*Hills* v. *Aronsohn* (1984) 152 Cal.App.3d 753 [199 Cal.Rptr. 816], and authorities cited therein.)

■ There are, however, three exceptions to the three-year limitation period—fraud, intentional misrepresentation, and the presence of a *nonther-*

*apeutic* "foreign body" in the plaintiff's body. It is the latter exception on which the Ashworths rely.

The "foreign body" exception the Legislature preserved in its 1975 amendments to section 340.5 has a long lineage in California common law. Indeed the first case to apply the discovery rule to medical malpractice cases of any kind involved the presence of a "foreign body." In *Huysman* v. *Kirsch* (1936) 6 Cal.2d 302 [57 P.2d 908], a surgeon left a rubber drainage tube in a patient's abdomen during a hysterectomy. The patient suffered pain, injury, and illness until this tube was removed about 20 months later. The California Supreme Court held the statute of limitations started running not when the surgeon left the tube behind, but when the patient discovered its existence at the time of the second operation.

Significantly, the court set forth three distinct reasons for this conclusion: (1) The *tort continued* until removal of the offending object. "[P]laintiff's cause of action accrued as much by reason of the alleged continuous breach of duty . . . in failing to remove [the foreign object] . . . as it did because of the alleged negligent act of the defendant on the day of the operation . . . "Where the tort is continuing, the right of action is also continuing." [Citation omitted.]' " (6 Cal.2d at p. 308, quoting with approval from *Sly* v. *Van Lengen* (1923) 198 N.Y.S. 608, 610).

(2) The *operation was not complete* until all the equipment used in the operation had been removed. " 'The operation begins when the incision is made, and ends when the opening has been closed in the proper way, after all the appliances necessary to a successful operation have been removed from the body. . . . The removal of the sponges or packs is a part of the operation, and an operation cannot be said to be concluded until such removal takes place.' " (6 Cal.2d at p. 311, quoting with approval from *Barnett's Admr.* v. *Brand* (1915) 165 Ky. 616 [177 S.W. 461].

(3) The patient was unaware of the hidden object until it was *discovered* during the subsequent operation. "[T]he appellants in this action had no knowledge of the presence of the drainage tube in the body of Mrs. Huysman until it was removed therefrom. . . . It cannot be said, . . . that they had any knowledge whatever of the cause of her failure to recover from the operation, or that they could have gained that knowledge by the exercise of due care and diligence prior to [the date of the operation removing the drainage tube]. . . . We can see no good reason why, if the statute of limitations did not begin to run in [a previous case holding statute began running against workers only when they discovered their illnesses were caused by inhaling dust] . . . that it should run [in this case]. . . ." (6 Cal.2d at pp. 312-313.)

The rule and three rationales announced in *Huysman* constitute the common law "foreign body" doctrine the California Legislature codified in its 1975 amendment of section 340.5. As of the time the amendment was enacted, the doctrine was well settled in a number of jurisdictions (Annot., When Statute of Limitations Commences to Run Against Malpractice Action Based on Leaving Foreign Substance in Patient's Body (1976) 70 A.L.R.3d 7; Annot., Medical Malpractice: Applicability of "Foreign Object" Exception in Medical Malpractice Statutes of Limitations (1986) 50 A.L.R.4th 250) and had been further refined in California by decisions of the Courts of Appeal. (See, e.g., *Trombley* v. *Kolts* (1938) 29 Cal.App.2d 699, 708 [85 P.2d 541] [the statute does not begin running even if the patient learns of the existence of the "foreign body" where she remains a patient of the defendant doctor and he fails to remove it]; *Ehlen* v. *Burrows* (1942) 51 Cal.App.2d 141, 145-146 [124 P.2d 82] [the statute does not begin running until a patient discovers broken roots of teeth left behind during tooth extractions]; *Pellet* v. *Sonotone Corp.* (1942) 55 Cal.App.2d 158, 160-161 [130 P.2d 181] [applies "foreign substance" exception to plaster of paris left in patient's ear]; *Agnew* v. *Larson* (1947) 82 Cal.App.2d 176, 182 [185 P.2d 851] ["foreign substance" exception applies to cancer-causing drug physician prescribed for patient several years earlier]; *Bowers* v. *Olch* (1953) 120 Cal.App.2d 108, 117 [260 P.2d 997] [exception applies to surgical needle].)

As early as 1942 the Courts of Appeal had focussed in on the third rationale of the *Huysman* opinion and crystalized a standard formulation of a "foreign body" or "foreign substance" rule. This was first articulated in *Pellet* v. *Sonotone Corp., supra,* 55 Cal.App.2d 158: "[I]f a foreign substance is negligently left in the human body by a defendant, the statute of limitations does not commence to run until the plaintiff has discovered the fact that a foreign substance has been left in his body or through the use of reasonable diligence should have discovered it. [Citation omitted.]" (*Id.* at p. 160.) This formulation was amplified in *Agnew* v. *Larson, supra,* 82 Cal.App.2d 176, to make it clear the patient must be aware not only of the foreign substance itself but that "the statute of limitations does not commence to run until the patient knows, or in the exercise of ordinary care should have known, the *cause of his injury.*" (*Id.* at p. 182, italics added.) Over the years this "discovery rule" rationale for the "foreign body" exception was extended to other forms of medical malpractice as well. Nonetheless, despite disuse by the Courts of Appeal the "continuing tort" and "incomplete operation" rationales the Supreme Court articulated in *Huysman* remain viable to prevent running of the statute of limitations while a "foreign body" remains present inside a patient. In most situations, including the instant case, any of these three statements of the rule will produce

the same result. Thus, we need not consider further the implications of the "continuing tort" and "incomplete operation" rationales for the rule.

In cases decided after the 1975 amendment codifying the "foreign body" exception the courts interpret the statutory rule to perpetuate the standard common law formulation of the "discovery rule" rationale. For example, where the surgeon had inadvertently failed to remove a screw from a patient's hip, the Court held: "[T]he statute of limitations commences in a medical malpractice case only when the plaintiff discovers the injury *and its negligent cause* or through the exercise of reasonable diligence should have discovered them. (*Whitfield* v. *Roth,* 10 Cal.3d 874, 885 . . .; *Wozniak* v. *Peninsula Hospital,* 1 Cal.App.3d 716, 722. . . . The question therefore is when did plaintiff discover or in the exercise of reasonable diligence should have discovered, that the screw was *improperly* left in his hip . . . ." (*Osborne* v. *County of Los Angeles* (1979) 91 Cal.App.3d 366, 370 [154 Cal.Rptr. 129], italics in original.) This is consistent with the way the California Supreme Court has interpreted section 340.5 as to cases not predicated on the "foreign body" exception. (*Sanchez* v. *South Hoover Hospital* (1976) 18 Cal.3d 93, 101 [132 Cal.Rptr. 657, 553 P.2d 1129].)

■ The 1975 amendments of section 340.5 added only one qualification to its incorporation of the common law foreign body doctrine. The statute now requires that the "foreign body" have no "therapeutic purpose or effect." However, this requirement can be satisfied even if the foreign body had such a purpose or effect when originally placed in the patient's body. It is enough the foreign body was not removed after it had ceased having this therapeutic purpose or effect. Otherwise the nine-inch drainage hose left in the patient in *Huysman* and all the other sponges, pins, needles, and similar objects left in patients in the paradigm "foreign body" cases would not qualify for the "foreign body" exception. For, in nearly all these cases, the tube or sponge or other object indeed had a "therapeutic purpose or effect" at the time it was inserted into the patient's body—to drain the wound or absorb blood or hold a bone in place. But the continued presence of these items for weeks, months or years after the wound was closed had no therapeutic value. At some point these articles only represented a threat of injury. Sensibly, after enactment of section 340.5 the "foreign body" rule still applies to "foreign bodies" even though they had a "therapeutic purpose or effect" at the time they were placed in the patient so long as it can be shown they were allowed to remain there too long. (See, e.g., *Osborne* v. *County of Los Angeles, supra,* 91 Cal.App.3d p. at p. 370 [Screw inserted during initial hip surgery to further healing inadvertently not removed at time of subsequent surgery to remove pins and screws. Held subject to "foreign body" discovery rule even though "[w]hen originally inserted, the screw was presumably a therapeutic prosthetic device"].

■ It is said the statutory "foreign body" exception only tolls the three-year outside limitation period and not the one-year "discovery" period. (*Hills* v. *Aronsohn, supra,* 152 Cal.App.3d at p. 761.) What this means, of course, is that the "foreign body" exception in section 340.5 lifts the three-year outside limit entirely if a nontherapeutic "foreign body" has been left inside a patient. It gives that patient an unlimited time to discover or to use reasonable diligence to discover the presence of the "foreign body." But once the patient discovers or through reasonable diligence would have discovered the "foreign body" and its role in her injury she only has one year to file her lawsuit against the practitioners responsible for leaving the "foreign body" inside her. That is, the patient is not free to completely ignore the statute of limitations just because she finds out her doctor left something inside her body which is causing her harm. She must still act within one year of her discovery the "foreign body" exists and is the negligent cause of her injury.

■ B. *Under the "Foreign Body" Doctrine, the Statute of Limitations Did Not Commence Running Until the "Cotton Pledgets" Were Discovered to Be the Negligent Cause of Ms. Ashworth's Injuries at the Time of the Operation in 1983*

In the instant case it is apparent Mrs. Ashworth did not discover the "cotton pledgets" left near her left kidney were the negligent cause of the oozing wound on her left side until Dr. Kuyt operated on her in November 1983. ■ Respondents point to a single clause in Dr. Barloon's lengthy operation report as conclusively establishing the Ashworths knew or should have known the guilty "foreign bodies" had been left in Mrs. Ashworth's body. This clause appears in the middle of the third single-spaced paragraph on the first page of this report and reads: "We use a horizontal mattress suture of #2-O chromic catgut through and through and tie it over *a cardiac felt* to control the parenchymal oozing." (Italics added.) Respondents contend it is this cardiac felt which comprises the "foreign body" involved in this case and this reference in the doctor's report is enough to put the Ashworths on notice the "foreign body" was left in her body. However, it remains a triable issue whether this passing mention of the use of cardiac felt during the operation means the Ashworths knew or should have known a "foreign body" remained in her body.

First, it is a triable issue whether the *single* "cardiac felt" mentioned in the report indeed is the same *two* "cotton pledgets" which allegedly caused Mrs. Ashworth's problems. From the record it is not entirely clear the "cardiac felt" is the same thing as a "cotton pledget" or that it is the type of "foreign object" Dr. Kuyt recovered from Mrs. Ashworth during the operation in 1983. Even assuming it is the same specie of object it is not clear the

reference to "cardiac felt" accounts for both "cotton pledgets" Dr. Kuyt discovered. It is entirely possible some extra "cotton pledget" or "pledgets" negligently fell into the area of the kidney in addition to or unconnected to the "cardiac felt" to which the report refers.

Secondly, even if the report and the complaint indeed are referring to the very same "foreign body," the report mentions the use of several other articles—a "tonsil clamp," "vein retractors," among them—to control bleeding. We doubt these were left behind. Yet there is no specific mention in the record before the court that they were removed, just as there was no specific mention the "cardiac felt" was removed. Someone reading the report could have reasonably concluded the felt was a temporary measure similar to the clamps and retractors and was removed when it served its purpose. Indeed Dr. Kuyt states in his declaration it would not be medically appropriate to leave cardiac felt or a "pledget" inside a person's body after the operation was completed.

 Finally, even if we were to hold this brief entry in the report placed the Ashworths on notice of the continuing presence of the "foreign body," it would remain a triable issue whether they knew or should have known this "cardiac felt" was the negligent cause of Mrs. Ashworth's injury. (*Osborne* v. *County of Los Angeles, supra,* 91 Cal.App.3d at p. 370 [Statute of limitations did not start running even though patient became aware screw had not been removed. "[T]he screw might have been left in intentionally in 1968 and for sound medical reasons. . . . The record shows no . . . reasonable suspicion on plaintiff's part that the screw was *improperly* left in his hip"], italics in original.)

Furthermore, the trial court found—and properly so—there was a "triable issue" whether these "foreign bodies" had a "therapeutic purpose or effect." It is undisputed the Ashworths filed their complaint alleging these "foreign bodies" were the proximate cause of Mrs. Ashworth's medical injuries in November 1984. This was within the one year allowed to file a lawsuit after "discovery" of the foreign body. Accordingly, if the 1984 lawsuit was the first and only one the Ashworths had filed, it would be hard to argue they had exceeded the limitation periods established by section 340.5.

 Respondents point out, however, that the Ashworths did file a malpractice lawsuit against them in 1977. This complaint was worded very broadly. It encompassed any and all acts of malpractice respondents may have committed in their treatment of Mrs. Ashworth "in November 1976, and before and after that time." Moreover, in deposition testimony which was before the court on the summary judgment motion, Mrs. Ashworth

stated she had known of the oozing wound on her left side at the time appellants filed the 1977 lawsuit. She further said in the deposition she felt the wound was caused by something respondents did. Accordingly, respondents argue, the Ashworths "discovered" the injury to Mrs. Ashworth's left side and its "negligent cause" no later than November 1977 when they filed their first lawsuit against respondents.

, It is apparent, if nothing else from the pleadings in the 1977 lawsuit, that Mrs. Ashworth "discovered" the oozing wound on her left side and "suspected" it was caused by *some* sort of negligence during one or more of the operations respondents performed on her in 1976. However, it is equally apparent Mrs. Ashworth remained unaware of the specific "negligent cause" of the oozing wound, that is, the "foreign bodies" left inside her during the first 1976 operation, until Dr. Kuyt found them during the 1983 operation. Thus, the next issue we must resolve is when the statute of limitations begins running on a medical injury attributable to a "foreign body" left inside a patient. Does it start running when the patient discovers she is suffering an injury and figures out it would not be happening except for some sort of malpractice? Or does it only begin running when the patient discovers or through *reasonable* diligence would have discovered a foreign body was left inside her body and discovers or through *reasonable* diligence would have discovered this foreign body is the precise cause of the injury she is experiencing? A companion issue is what constitutes "reasonable" diligence in the search for a foreign body inside a patient and the role of that foreign body in the patient's injury.

, The answer to this cluster of issues lies, in part, in an examination of what constitutes the cause of action alleged in the Ashworths' 1984 complaint. Section 340.5 refers to the "action" which will be barred if it is filed more than one year after discovery as "an action for injury . . . against a health care provider based upon such person's alleged professional negligence, . . . ." The same statute defines "professional negligence" as "a negligent act . . . by a health care provider in the rendering of professional services, which . . . is the proximate cause of a personal injury . . . ." (Italics added.)

Under the language of this statute, therefore, a medical malpractice cause of action is defined as a single specific act which proximately causes injury. Thus, respondents' negligent act in failing to remove the "foreign body" near Mrs. Ashworth's kidney which allegedly caused the oozing left side wound represents a separate and distinct cause of action. "Discovery" of other specific negligent acts and their presumed consequences did not represent "discovery" of *this* negligent act and its consequences. That Mrs. Ashworth knew she had the oozing left side wound as well as her other injuries

and even her apparently *erroneous* suspicion that this wound was the result of other acts of malpractice she knew about does not mean she had discovered this separate cause of action based on the negligent failure to remove the foreign bodies from the area of her kidney.

True, there is language in a recent California Supreme Court opinion (*Jolly* v. *Eli Lilly & Co.* (1988) 44 Cal.3d 1103 [245 Cal.Rptr. 658, 751 P.2d 923]) suggesting the section 340.5 statute of limitations begins running at the moment a patient experiences an injury and "suspects" the injury is the result of *any* form of medical malpractice. This case involved a different statute of limitations—section 340.3. But it, like section 340.5, hinges on the meaning of a plaintiff's "discovery" of her cause of action. As the high court said in *Jolly*: "Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her. . . . A plaintiff *need not be aware of the specific 'facts'* necessary to establish the claim; that is a process *contemplated by pretrial discovery*. . . . So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (44 Cal.3d at pp. 1110-1111, fn. omitted, italics added.)

However, this Supreme Court language does not address a cause of action based upon an essentially *undiscoverable* act of malpractice—the failure to remove a foreign body from within the depths of the patient's innermost tissues. The California Legislature has placed this specie of malpractice in an entirely different category. The lawmakers provided the presence of the foreign body tolls the section 340.5 limitation period for an indefinite time, in effect, until the foreign body itself is by some means discovered or through reasonable diligence would have been discovered.

The special legislative preference for this particular form of malpractice is justified by the unique characteristics of the "foreign body" exception. In contrast to other malpractice actions, a cause of action based on the belated discovery of a "foreign body" typically is not "stale." In an ordinary medical malpractice case, the negligent event will have begun and ended years earlier when the practitioner misdiagnosed the condition or committed some specific error during a treatment or operation. Only the ill effects will have surfaced late. Generally the sole evidence about what the doctor did or did not do will be found in records and recollections which may have deteriorated badly. In a "foreign body" case, on the other hand, the negligent event, the presence of the destructive object—and not just its harmful effects—will have continued up to the moment of discovery. Moreover, that negligent cause is *palpable*. It can be seen and touched at the trial. Its connection to the injuries the patient suffered will have been examined at

the time it was discovered and thus will not be dependent entirely on musty records or fading memories. As the Georgia Supreme Court observed about the unique status accorded "foreign bodies" in a medical malpractice statute similar to what we have in California: "In such situations the danger of belated, false or frivolous claims is eliminated. The foreign object in the patient's body is directly traceable to the doctor's malfeasance." (*Dalbey* v. *Banks* (1980) 245 Ga. 162, 164 [264 S.E.2d 4].)

The "foreign body" exception is unique in another sense. It would be unreasonable to expect the ordinary processes of "pretrial discovery" mentioned in the *Jolly* opinion—depositions, interrogatories, and the like—to identify the presence of a foreign body and its role in causing a patient's symptoms. Nor is it reasonable to require that before or after filing her lawsuit a plaintiff must consent to an exploratory operation opening her innards to a probing search for a possible "foreign body" or to determine whether a suspected foreign body indeed is the negligent cause of her injuries. In *Hills* v. *Aronsohn, supra,* 152 Cal.App.3d 753, this court held the discovery rule could not be construed to require surgery in order to confirm a plaintiff's suspicions about the negligent cause of her injury. "The malpractice litigant is required to diligently pursue her claim through discovery of the cause of her injury. . . . It is one thing to force inquiry. But it is quite another to say that Ms. Hills gave up her right to recover because she refused to have a mastectomy sooner. A plaintiff is not required to discover the negligent cause of her injuries at all costs to her own health and welfare. Rather the plaintiff is only required to take *all reasonable steps* to protect her health." (152 Cal.App.3d at p. 760, italics added.)

A commonsense interpretation of the language of section 340.5 leads to but one conclusion. The Legislature intended to leave the statute of limitations wide open whenever a "foreign body" has been left inside a patient at least until the time this "foreign body" is actually discovered and its role in the patient's injuries can be ascertained or through reasonable diligence would have been discovered and ascertained. It is reasonable to anticipate "discovery" of these "foreign bodies" often will come about as a byproduct of operations occurring much later and prompted by reasons having nothing to do with a search for what caused a certain medical injury. A patient's mere suspicion she was the victim of some sort of malpractice cannot start the statute running as to a cause of action based on the presence of "foreign bodies." Only discovery of those particular foreign bodies and their causal relation to the patient's injuries can start the clock.

In the instant case, Mrs. Ashworth remained unaware the so-called pledgets were "foreign bodies" which had been left inside her and were the proximate cause of the persistent oozing wound on her left side until No-

vember 11, 1983, when Dr. Kuyt discovered them while operating on her. Accordingly, the section 340.5 statute of limitations did not start running as to the cause of action based on those "foreign bodies" until the date Dr. Kuyt made her aware of what he had found and the probability these "foreign bodies" caused the injury she had been suffering for several years. From that date, the Ashworths had one year to file a complaint alleging this cause of action. They filed their lawsuit November 9, 1984, which is within that year and thus complied with the requirements of section 340.5.

## ■ II. NEITHER THE FILING NOR THE DISMISSAL WITHOUT PREJUDICE OF THE ASHWORTHS' 1977 LAWSUIT "BARS" THE 1984 CAUSE OF ACTION BASED ON THE PRESENCE OF "FOREIGN BODIES" NOT DISCOVERED UNTIL 1983

The broadly defined malpractice count in the 1977 complaint was not resolved by a jury verdict for the defendants. Nor was it dismissed *with prejudice*. Instead, the Ashworths' first case was dismissed at the court's own instance under section 583.[2] Section 581, subdivision (b) provides that such dismissals are "without prejudice."[3] Assuming the statute of limitations has not yet run on a cause of action dismissed under this statute, that dismissed action can be revived simply by filing it anew.

■ If the 1977 lawsuit had gone to trial and resulted in a defense verdict, we might be faced with a difficult problem under the doctrines of res judicata and collateral estoppel. Indeed this is how the trial court cast its decision. It ruled the section 583 dismissal of the 1977 case created a "bar" to prosecution of the 1984 case against the same defendants. And indeed if one considered the dismissal of the 1977 case as a decision on the merits as to the malpractice cause of action alleged in that complaint one could raise a plausible argument the 1984 case was barred. The Ashworths pled a very broad cause of action in their 1977 complaint. For res judicata purposes,

---

[2] The relevant sections of chapter 1.5 are 583.310 and 583.360, subdivision (a), set forth below.

"§ 583.310. An action shall be brought to trial within five years after the action is commenced against the defendant." "§ 583.360. (a) An action shall be dismissed by the court on its own motion or on motion of the defendant, after notice to the parties, if the action is not brought to trial within the time prescribed in this article."

[3] Section 581, subdivision (b) provides in relevant part: "An action may be dismissed in any of the following instances:

". . . . . . . . . . . . . . . . . .

"(4) By the court, *without prejudice,* when dismissal is made pursuant to the applicable provisions of Chapter 1.5 (commencing with Section 583.110).

". . . . . . . . . . . . . . . . . .

"(g) The court may dismiss *without prejudice* the complaint in whole, or as to that defendant, when dismissal is made under the applicable provisions of Chapter 1.5 (commencing with Section 583.110)." (Italics added.)

this cause of action arguably could be construed to have encompassed the injury and the negligent act which constitute the cause of action alleged in their 1984 complaint. Thus, a decision *on the merits* as to the 1977 complaint might well bar the Ashworths' 1984 complaint. This could be so even though in 1977 they were unaware of the existence of the "foreign body" which is the gravamen of their later action.

As we have seen, however, a section 583 dismissal is not a decision on the merits. Indeed under section 581 it is specifically made a dismissal "without prejudice." Accordingly, we do not have to ask whether dismissal of the 1977 case bars the 1984 case either under the doctrine of collateral estoppel or res judicata. That case has been washed away by the trial court's dismissal under section 583. It is as if that complaint and its broad cause of action simply never existed.

Respondents concede the section 583 *dismissal* of the 1977 case does not "bar" the 1984 case under res judicata or collateral estoppel. ■ However, they argue the *filing* of the 1977 case constitutes irrefutable evidence the Ashworths had "discovered" their malpractice cause of action against respondents by that time. Accordingly, respondents maintain the one-year limitation period of section 340.5 had expired several years before the 1983 operation which disclosed the presence of the "foreign bodies" near Mrs. Ashworth's kidney and the subsequent filing of the present case in 1984.

There is no doubt the filing of the 1977 case demonstrated the Ashworths knew Mrs. Ashworth was suffering an injury. Furthermore, the filing of this case is irrefutable evidence they suspected respondents had committed malpractice of some sort during one or both of the operations they conducted on Mrs. Ashworth during 1976. Respondents rely on *Jolly* v. *Eli Lilly, supra,* and its antecedents to argue that once a patient knows enough facts to "suspect" her injuries are the result of *any* form of malpractice the discovery limitation period of section 340.5 begins running.

For reasons discussed earlier in this opinion, however, the Legislature has placed the "foreign body exception" in a different status. It would be inconsistent with the purpose and rationale of this statutory exception to terminate the tolling created by the presence of a "foreign body" just because the patient suspects—quite possibly in error—that a medical practitioner committed some *other* type of malpractice. The Legislature meant tolling to continue until the patient discovers or through *reasonable* (including nondangerous) diligence would have discovered the "foreign body" itself *and the role this "foreign body" played in the patient's suffering.*

The filing of the 1977 malpractice lawsuit provided undeniable evidence the Ashworths suspected other forms of malpractice. Accordingly, the stat-

ute of limitations commenced running at that time as to any cause of action for injuries attributable solely to other forms of malpractice and not to the presence of the "foreign bodies." Yet the filing of the 1977 lawsuit supplies no evidence whatsoever the Ashworths had discovered the "foreign bodies" and their role in Mrs. Ashworth's suffering which are the gravamen of the 1984 lawsuit. Thus we agree with respondents the filing of the 1977 lawsuit provides the best possible proof of something. However, in terms of the "foreign body" exception of section 340.5, we agree with the Ashworths that the something it proves is an irrelevancy.

For these reasons, we find triable issues remain (1) as the trial court recognized, whether the "pledgets" were nontherapeutic in purpose and effect by the time they were removed, and, (2) whether, more than one year before she filed the instant action, appellant discovered or should have discovered these nontherapeutic foreign bodies existed in her body and were the negligent cause of her injury. Since these triable issues remain, summary judgment was inappropriate as to the cause of action for injuries proximately caused by the presence of these foreign bodies, although it was appropriate for any injuries attributable solely to other forms of malpractice which may have been committed against Mrs. Ashworth.

### DISPOSITION

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

Lillie, P. J., and Soven, J.,* concurred.

The petitions for a rehearing were denied January 20, 1989, and the opinion was modified to read as printed above. The petition of all respondents for review by the Supreme Court was denied March 23, 1989.

---

* Assigned by the Chairperson of the Judicial Council.