Filed 2/18/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BRENDAN MAHER,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF ALAMEDA et al.,<br><br>        Defendants and Respondents. | A135792<br><br>(Alameda County<br>Super. Ct. No. RG11573562) |

Surgeons implanted a biliary stent in plaintiff Brendan Maher during emergency abdominal surgery in 1996. Maher alleges he was unaware of the stent's placement until it was discovered and removed in August 2010 after he sought treatment for abdominal pain. In April 2011, Maher sued the health care providers who treated him in 1996 and 1997 for professional negligence in not timely removing the stent, or informing him of its placement and the fact it was designed to be temporary. The defendants successfully demurred on statute of limitations grounds, and Maher appeals from the ensuing judgments. He contends the statute of limitations was tolled from 1996 to 2010 under the "foreign body" exception of Code of Civil Procedure section 340.5 (section 340.5). We agree, and reverse the judgments of dismissal. We affirm the order sustaining the demurrer of Alameda County Medical Center (ACMC) to Maher's separate cause of action for denial of access to his medical records without leave to amend.

## I.  BACKGROUND

**A.  *Parties and Pleadings***

Maher filed his original complaint on April 29, 2011, alleging causes of action for (1) negligence and (2) failure to provide access to his medical records as required by Health and Safety Code section 123100 et seq. The complaint named as defendants

ACMC, Frederick Wright, M.D., Ralph Bernstein, M.D., Lifelong Medical Care–Berkeley Primary Care (Lifelong), Vaneida White, M.D.,[1] and Doe defendants. Maher filed a first amended complaint a few days later, naming Alameda County as an additional defendant and substituting Sutter East Bay Hospitals dba Alta Bates Summit Medical Center (Alta Bates)[2] and J. Dougal MacKinnon for two of the Doe defendants. Following entry of orders sustaining demurrers by some of the defendants, Maher filed his second amended complaint (SAC), which is in issue on this appeal.

The SAC alleged in pertinent part as follows:

Maher was injured by a gunshot in Berkeley, California on May 24, 1996. He was transported by ambulance to ACMC at Highland Hospital where he underwent medical procedures related to his injuries. As part of the procedures to address abdominal injuries sustained by Maher, a biliary stent was placed in Maher's body. Maher was unconscious or otherwise incapacitated secondary to his injuries when the stent was implanted. Maher remained an inpatient at ACMC until July 10, 1996, when he was transported by ambulance to Alta Bates for rehabilitative care.[3] He remained at Alta Bates until August 8, 1996. Following his discharge from Alta Bates, Maher received outpatient treatment from Lifelong and Dr. White until February 12, 1997, which was the last date he was seen or treated by any of the defendants for his gunshot wound injuries.

On August 10, 2010, Maher went to the emergency room at Kaiser Hospital in Los Angeles, California because of abdominal pain and vomiting. Blood tests indicated his liver enzyme level was consistent with biliary obstruction and followup imaging revealed the existence of the biliary stent in his body. Maher's physicians at Kaiser informed Maher (1) the biliary stent was by design intended to be temporary and should have been

---

[1] Sued erroneously as Vanieta White.

[2] Sued erroneously as Alta Bates—Herrick Hospital.

[3] The admitting diagnosis of defendant MacKinnon at Alta Bates was alleged to include the following: "Status post gastrointestinal visceral abdominal injury including Bilary [sic] stent placement, residual Bilaryoma [sic], liver laceration, diaphragm laceration and superior vena cava laceration with significant blood loss . . . ."

2

explanted generally between three to six months after being placed, but in no event should it have been allowed to remain for over 14 years; (2) the stent lost any efficacy it may have had within one year of placement and had at some point begun to disintegrate and had already migrated from the site where it was originally placed; and (3) the stent should be removed immediately. The stent was removed at Kaiser Hospital less than 24 hours after it was discovered.

Maher was unaware of any stent in his bile duct before August 10, 2010. None of the health care providers involved in his gunshot wound treatment had informed him of its placement, the fact it was designed to be temporary, or the need to monitor or remove it. The defendants breached their duties of care to Maher by, among other things, negligently failing to inform Maher of these facts, failing to provide him with adequate discharge instructions or followup treatment, and failing to timely remove the biliary stent. As a result of defendants' negligence, Maher sustained injury to his health and activity, and to his person, causing pain and suffering, and incurred economic and noneconomic losses, past, present, and future, including future medical treatment and expenses.

Maher's second cause of action for violation of Health and Safety Code section 123110 alleged that on September 7, 2010, he requested access to his patient records from ACMC and ACMC failed to comply with its legal duty to allow him to inspect or copy his records. ACMC responded to Maher on September 13, 2010, stating: " 'Due to California Retention Laws, these records are no longer available.' "[4]

Defendants demurred to the negligence cause of action on the grounds in part that it was barred by the three-year statute of limitations for medical negligence claims under section 340.5.[5] Defendant ACMC demurred to the statutory patient records cause of

---

[4] According to the SAC, ACMC later produced "writings alleged to be [his] [p]atient [r]ecord," apparently in response to a discovery request in this litigation.

[5] Section 340.5 provides in relevant part: "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year

action on the grounds Maher failed to adequately allege damages resulting from the asserted violation, ACMC did not violate the law because it had no duty to retain Maher's records beyond seven years, and the statute did not cover records requested by a patient's attorney for purposes of bringing a civil action. Maher contended (1) the presence of a "foreign body" in his person—the biliary stent—which he did not discover until August 2010, made his negligence claims timely when he filed his original complaint in April 2011; and (2) he adequately pled a statutory violation and resulting damages.

**B. *Trial Court Ruling***

The trial court ruled the "foreign body" tolling exception did not apply to the biliary stent. It held an object intentionally left in the body for a therapeutic purpose following the completion of a medical procedure does not qualify as a "foreign body" for purposes of section 340.5. The court found Maher failed to allege a cognizable claim against ACMC for withholding patient records due to (1) the seven-year medical record retention period provided for by state regulations, and (2) Maher's failure to allege any damage he suffered as a result of the alleged violation in view of the fact he did not request the records until the stent had already been removed, and he admitted he obtained the records through discovery. The court sustained the defendants' demurrers without leave to amend. This timely appeal from the ensuing judgments followed.

## II. DISCUSSION

**A. *The Foreign Body Exception***

A demurrer tests the sufficiency of a plaintiff's complaint by raising questions of law. On appeal, we exercise our independent judgment to determine whether the complaint states a cause of action. (*City of Morgan Hill v. Bay Area Air Quality Management Dist.* (2004) 118 Cal.App.4th 861, 869.) A trial court errs in sustaining a

---

after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first. *In no event shall the time for commencement of legal action exceed three years unless tolled for any of the following*: (1) upon proof of fraud, (2) intentional concealment, or (3) *the presence of a foreign body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person. . . .*" (Italics added.)

4

demurrer when the plaintiff has stated a cause of action under any possible legal theory. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967.)

The demurrers to Maher's medical negligence cause of action raise a question of statutory interpretation to which certain familiar principles apply. We described these principles in *Chosak v. Alameda County Medical Center* (2007) 153 Cal.App.4th 549: "Our overriding objective when interpreting a statute 'is to determine the drafter's intent.' [Citation.] In making that determination, we look first to the words of the statute because they ' " 'generally provide the most reliable indicator of legislative intent.' " ' [Citation.] '. . . We begin by examining the statutory language, giving it a plain and commonsense meaning. [Citation.] We do not, however, consider the statutory language in isolation; rather, we look to the entire substance of the statutes in order to determine their scope and purposes. [Citation.] That is, we construe the words in question in context, keeping in mind the statutes' nature and obvious purposes. [Citation.] We must harmonize the various parts of the enactments by considering them in the context of the statutory framework as a whole.' [Citation.] [¶] If this analysis demonstrates that the statute's language is clear and unambiguous, 'it governs. . . .' [Citation.] 'If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.] '[I]t is appropriate to consider 'the consequences that will flow from a particular interpretation. [Citation.]' [Citation.] Where more than one statutory construction is arguably possible, our 'policy has long been to favor the construction that leads to the more reasonable result. [Citation.]' [Citation.] . . . Thus, our task is to select the construction that comports most closely with the Legislature's apparent intent, with a view to promoting rather than defeating the statute['s] general purpose, and to avoid a construction that would lead to unreasonable, impractical, or arbitrary results.' " (*Id.* at pp. 558–559 [construing a different aspect of section 340.5].)

Section 340.5 was passed in its present form as part of the Medical Injury Compensation Reform Act (MICRA), enacted in a special session of the Legislature convened in 1975 to address skyrocketing costs of medical malpractice insurance.

(Stats. 1975, 2d Ex. Sess. 1975–1976, ch. 1, § 25, pp. 3969–3970; Proclamation by the Governor, Stats. 1975, 2d Ex. Sess. 1975–1976, p. 3947.)  The cost of obtaining such insurance threatened at that time to force some hospitals and doctors to close their doors, curtail their services, or practice without insurance.  (*Fein v. Permanente Medical Group* (1985) 38 Cal.3d 137, 158.)  The amendments made to section 340.5 in 1975 were intended to address one of the factors considered to be driving malpractice premium increases—a largely indeterminate statute of limitations for medical malpractice cases in which the statute did not begin to run on a cause of action for malpractice until the plaintiff discovered his or her injury and its negligent cause or through the exercise of reasonable diligence should have discovered it.  (*Larcher v. Wanless* (1976) 18 Cal.3d 646, 654–656 (*Larcher*); *Brown v. Bleiberg* (1982) 32 Cal.3d. 426, 432–433.)

Thus, former section 340.5 had provided the statute of limitations would be "four years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever first occurs," but also allowed this limitation period to be tolled "for any period during which [the defendant] . . . failed to disclose any act, error, or omission upon which such action is based and which is known or through the use of reasonable diligence should have been known to him."  (Stats. 1970, ch. 360, § 1, pp. 771–772.)  The 1975 amendments to section 340.5 "worked a substantial change" in these tolling provisions.  (*Young v. Haines* (1986) 41 Cal.3d 883, 893.)  "The outside limit for initiating malpractice actions, regardless of the date of discovery, was reduced from four years under the 1970 statute to three years. More significantly, under the new statute this limit was tolled only for fraud, intentional concealment, or the presence of nontherapeutic and nondiagnostic foreign bodies." (*Ibid.*)  By its use of the phrase "In no event" in the amended statute the Legislature signaled its intention that the three exceptions it enumerated in section 340.5 were to be the *exclusive* grounds for allowing any medical malpractice claim to be brought on behalf of nonminors more than three years after the date of injury. (*Fogarty v. Superior Court* (1981) 117 Cal.App.3d 316, 320.)

6

Thus, the Legislature sought in MICRA to reduce the cost of malpractice in a reasonable manner, balancing " 'concern over the extended exposure of medical practitioners to malpractice liability' " with " 'a desire not to bar potentially worthy plaintiffs from court *before they have a fair chance to bring suit*.' " (*Steketee v. Lintz, Williams & Rothberg* (1985) 38 Cal.3d 46, 56 (*Steketee*), quoting *Larcher*, *supra*, 18 Cal.3d at p. 655, italics added.)[6] At the same time, the Legislature's obvious intention in 1975 was to curtail tolling of the three-year statute in the great majority of cases.

The following factors must therefore inform our analysis of the tolling language found in the statute: First, the Legislature intended to allow tolling in certain narrow circumstances in which even a diligent plaintiff would be *unfairly* deprived of the chance to bring suit. Second, instead of fully explicating the showing required to meet each of the three tolling exceptions, the Legislature chose instead to merely reference them in a shorthand list—"fraud," "intentional concealment," and "presence of a foreign body." By not spelling out the requirements for each exception, the Legislature was clearly expecting the courts to interpret them in light of prior precedents. We find *no* indication in the text of the statute or the context in which it was enacted that the Legislature intended to *broaden* the application of tolling in foreign body cases beyond the scope and rationale of the case law that had developed prior to 1975.

The seminal pre-1975 California decision recognizing tolling based on the presence of a foreign body was *Huysman v. Kirsch* (1936) 6 Cal.2d 302 (*Huysman*). The defendant, a physician and surgeon, made an incision in the plaintiff's abdomen in order to remove her cancerous uterus. (*Id.* at pp. 303–304.) The surgery was alleged to have taken place on January 3, 1931. (*Id.* at p. 304.) The defendant inserted a nine-inch rubber tube in the incision for the purpose of draining the wound, and closed the wound on that date without removing the rubber drainage tube. (*Ibid*.) The complaint further

---

[6] The Supreme Court recognized in *Steketee* that the quoted language from *Larcher* concerned the 1970 amendments to section 340.5, but it nonetheless found the statement fully applicable to the MICRA amendments. (*Steketee, supra*, 38 Cal.3d at p. 56.)

alleged that the defendant, without the knowledge or consent of the plaintiff, negligently allowed the drainage tube to remain enclosed in the plaintiff's abdomen from "on or about January 9, 1931," until 20 months later, at which time the defendant for the first time removed the tube from her body and the plaintiff first learned the tube had been permitted to remain in her body by the defendant. (*Ibid.*) The complaint alleged the defendant's negligence in permitting the tube to remain enclosed in the plaintiff's abdomen caused her to suffer ongoing painful illness and mental anguish. (*Id.* at pp. 304–305.)

The issue before the Supreme Court in *Huysman* was whether the complaint, filed on January 7, 1933, was barred on its face by the one-year statute of limitations for negligence then in effect. (*Huysman, supra*, 6 Cal.2d at p. 305.) The defendant's position was that his alleged negligence "was his failure to remove the drainage tube after it had served its purpose, *and this failure . . . occurred on January 9, 1931 . . .* ," which was also the date of injury that started the running of the limitations period. (*Id.* at pp. 305–306, italics added.) In other words, the fact pattern the Supreme Court faced in *Huysman* is quite similar to that presented here—a claim of medical negligence based on failing to timely remove a foreign body that has been deliberately left in a patient's body following surgery to serve a temporary, postoperative therapeutic purpose. As in this case, the medical negligence alleged "consisted in leaving the [foreign object] in the [body] after the purpose for which it had been left therein had been fully accomplished," and the issue before the court was whether the cause of action accrued before the plaintiff learned of its presence. (*Id.* at p. 307.)

The *Huysman* case and the foreign body exception in section 340.5 were carefully analyzed in *Ashworth v. Memorial Hospital* (1988) 206 Cal.App.3d 1046 (*Ashworth*), a case upon which Maher relies. *Ashworth* involved a medical malpractice action brought in 1984 based on the discovery that defendants had left cotton pledgets in the plaintiff's body following kidney surgery in 1976. (*Id.* at pp. 1052–1053.) The defendants claimed the action was barred by section 340.5. (*Ashworth*, at pp. 1053–1054.) The appellate

8

court first addressed the origins and application of the foreign body exception in the statute.

According to *Ashworth*, the statutory foreign body exception traces its lineage to *Huysman*. (*Ashworth, supra*, 206 Cal.App.3d at pp. 1055–1056.) The opinion describes *Huysman* as setting forth three distinct rationales for concluding that accrual of a medical negligence cause of action is tolled by the presence of a foreign body: (1) the tort continued until removal of the foreign object so that the plaintiff's right of action also continued, (2) the operation was not complete until all the equipment used in the operation and been removed, and (3) the patient was unaware of the presence of the drainage tube until it was removed and could not have gained that knowledge by the exercise of due care. (*Ibid.*) According to *Ashworth*, "[t]he rule and three rationales announced in *Huysman* [with one qualification discussed below] constitute the common law 'foreign body' doctrine the California Legislature codified in its 1975 amendment of section 340.5." (*Id.* at pp. 1056, 1057.)

While noting the appellate courts had focused on *Huysman*'s third rationale,[7] the *Ashworth* court emphasized the other two rationales articulated by the Supreme Court remain viable to prevent the running of the statute of limitations while a "foreign body" remains present inside a patient, noting in most such situations the three rationales produced the same result. (*Ashworth, supra*, 206 Cal.App.3d at pp. 1056–1057.) *Ashworth* goes on to observe the statute "added only one qualification," that the foreign body "have no 'therapeutic purpose or effect.' " (*Id.* at p. 1057.) But as to this language, *Ashworth* states: "[T]his requirement can be satisfied even if the foreign body had such a purpose or effect when originally placed in the patient's body. It is enough the foreign body was not removed after it had ceased having this therapeutic purpose or effect.

---

[7] See *Pellett v. Sonotone Corp.* (1942) 55 Cal.App.2d 158, a case in which plaster and cotton used to make a cast of the plaintiff's ear were inadvertently left in the ear. *Pellett* stated the rule as follows: "[I]f a foreign substance is negligently left in the human body by a defendant, the statute of limitations does not commence to run until the plaintiff has discovered the fact that a foreign substance has been left in his body or through the use of reasonable diligence should have discovered it." (*Id.* at p. 160.)

Otherwise the nine-inch drainage hose left in the patient in *Huysman* and all the other sponges, pins, needles, and similar objects left in patients in the paradigm 'foreign body' cases would not qualify for the 'foreign body' exception. For, in nearly all these cases, the tube or sponge or other object indeed had a 'therapeutic purpose or effect' at the time it was inserted into the patient's body . . . . But the continued presence of these items for weeks, months or years after the wound was closed had no therapeutic value. At some point these articles only represented a threat of injury. *Sensibly, after enactment of section 340.5 the 'foreign body' rule still applies to 'foreign bodies' even though they had a 'therapeutic purpose or effect' at the time they were placed in the patient so long as it can be shown they were allowed to remain there too long*." (*Id.* at p. 1057, italics added.) Based on its analysis, the *Ashworth* court found the plaintiff's malpractice cause of action was not barred by section 340.5. (*Ashworth,* at p. 1059.)

The post-MICRA cases principally relied upon by defendants are not inconsistent with *Ashworth*. (See *Hills v. Aronsohn* (1984) 152 Cal.App.3d 753 [silicone injections made for a therapeutic purpose were not foreign objects or substances for tolling purposes]; *Trantafello v. Medical Center of Tarzana* (1986) 182 Cal.App.3d 315 [acrylic substance implanted into the plaintiff's neck to maintain space between vertebrae was not a foreign body].) What distinguishes *Hills* and *Trantafello* is that in both cases the substances placed in the patient's body for a therapeutic purpose were intended to remain there permanently and *for that reason* did not come within the statutory foreign body exception. While *Trantafello* and *Hills* contain some language defendants construe to mean the foreign body exception only applies to objects or substances *inadvertently* introduced into the body (see *Trantafello*, at pp. 319–320 & *Hills*, at p. 765), such a suggestion is inconsistent with the facts in *Huysman* and *Ashworth*.[8]

---

[8] The parties also discuss *Osborne v. County of Los Angeles* (1979) 91 Cal.App.3d 366, which was not a foreign body tolling case. The plaintiff in *Osborne* suffered an infection stemming from pins and screws placed in his leg to treat injuries he had suffered in an automobile accident. (*Id.* at p. 368.) The defendant county's hospital had performed surgery to remove the pins and screws in 1968, but was negligent in doing so and left one screw in the patient's hip which prevented his infection from healing. (*Id.* at

In sum, we concur with *Ashworth* that (1) *Huysman* established California's common law foreign object tolling rule; (2) MICRA codified this exception; and (3) the "no therapeutic or diagnostic purpose or effect" qualification in section 340.5 means the foreign body exception does not apply to objects and substances intended to be *permanently* implanted, but items temporarily placed in the body as part of a procedure and meant to be removed at a later time do come within it. Defendants point to no legislative history or authority suggesting the Legislature intended to abrogate *Huysman* by adopting the "therapeutic or diagnostic purpose or effect" language in section 340.5. In our view, *Huysman* is still good law and is factually on point with the case before us. We therefore hold that Maher's negligence claims should not have been dismissed under section 340.5.

## B. *Medical Records*

Maher asserted a cause of action against ACMC under a chapter of the Health and Safety Code entitled "Patient Access to Health Records" (Health & Saf. Code, § 123100 et seq.; Patient Access Law). Maher alleged he incurred attorney fees and other unspecified damages by reason of ACMC's failure to timely provide access to the records. ACMC demurred in part on the ground there was no violation of the Patient Access Law because its provisions were enacted to facilitate the provision of medical care, and Maher did not allege he was deprived of information needed to make health care decisions. We agree ACMC did not violate the statute, and we further find Maher cannot amend his complaint to state a viable cause of action under either the Patient Access Law or a related statute—Evidence Code section 1158—which concerns attorney access to a client's medical records in anticipation of litigation.

---

pp. 368–369.) Applying the pre-1975 discovery rule, the Court of Appeal found the negligence occurred in 1968 when the hospital failed to remove the screw, but that the plaintiff's cause of action was tolled until 1976 when he learned for the first time his ongoing medical problems stemmed from its presence in his hip. (*Osborne*, at p. 370.) The *Osborne* court made no interpretation of the foreign body exception in section 340.5.

11

Health and Safety Code section 123110, subdivision (a) provides any "adult patient" or "patient representative" is "entitled to inspect patient records upon presenting to the health care provider a written request for those records and upon payment of reasonable clerical costs incurred in locating and making the records available." For purposes of the Patient Access Law, "patient" is defined as a "patient or former patient" of the health care provider, and "patient representative" is defined as a parent or guardian of a minor patient, the guardian or conservator of the person of an adult patient, the beneficiary or personal representative of a deceased patient, or an agent as defined in Probate Code section 4607 to the extent necessary for the agent to fulfill his or her defined duties under the Probate Code. (Health & Saf. Code, § 123105, subds. (c), (e).) In this case, however, Maher alleged he requested review of his records "by and through his attorney." Maher's attorneys are neither patients nor patient representatives entitled to obtain his medical records under the provisions of the Patient Access Law. (Cf. *Bugarin v. Chartone, Inc*. (2006) 135 Cal.App.4th 1558, 1564–1565 [finding attorneys for patients were intended to be excluded from the similarly worded federal regulation pertaining to access to medical records].)

This is consistent with the legislative intent reflected in the findings and declarations section of the Patient Access Law: "The Legislature finds and declares that *every person having ultimate responsibility for decisions respecting his or her own health care* also *possesses a concomitant right of access* to complete information respecting his or her condition and care provided. Similarly, persons having responsibility for decisions respecting the health care of others should, in general, have access to information on the patient's condition and care. It is, therefore, the intent of the Legislature in enacting this chapter to establish procedures for providing access to health care records or summaries of those records *by patients and by those persons having responsibility for decisions respecting the health care of others*." (Health & Saf. Code, § 123100, italics added.) Thus, in our view, the Patient Access Law was not intended to provide redress for patients whose attorneys are seeking access to medical records in contemplation of

12

litigation against the health care provider. Such access is instead governed by Evidence Code section 1158.[9]

Evidence Code section 1158 states in relevant part: "Whenever, prior to the filing of any action . . . , an attorney at law or his or her representative presents a written authorization therefor signed by an adult patient . . . , a [health care provider] shall make all of the patient's records under his, hers or its custody or control available for inspection and copying by the attorney at law or his, or her, representative, promptly upon the presentation of the written authorization." The apparent purpose of section 1158 is to permit a patient to evaluate the treatment he or she received before determining whether to bring an action against the medical provider. (*Thornburg v. Superior Court* (2006) 138 Cal.App.4th 43, 50 (*Thornburg*).)

Evidence Code section 1158 contemplates a proceeding to enforce its provisions as follows: "Failure to make the records available, during business hours, within five days after the presentation of the written authorization, may subject the person or entity having custody or control of the records to liability for all reasonable expenses, including attorney's fees, incurred in any proceeding to enforce this section." In other words, the remedy for a violation of section 1158 is to bring a "proceeding" to enforce its requirements. Maher thus would have been entitled to assert a cause of action seeking to compel ACMC to provide the medical records he was seeking in contemplation of this action.[10] If successful, he would be entitled to the attorney fees and expenses he reasonably incurred in the litigation to enforce the statute, or to any excess copying

---

[9] Maher points out one provision of the Patient Access Law contemplates requests for records of medical services rendered to support an appeal regarding eligibility under public benefits programs such as Medi-Cal and SSI (Supplemental Security Income). (See Health & Saf. Code, § 123110, subd. (d).) We decline to construe this as completely abrogating the legislative declaration that this law—in contrast to Evidence Code section 1158—was primarily intended to further the patient's health care, not to facilitate prelitigation discovery.

[10] As recognized in *Thornburg*, a patient can also bring a claim to recover copying costs charged in excess of those allowed by the statute. (*Thornburg, supra*, 138 Cal.App.4th at p. 46.)

charges imposed. Section 1158 contemplates no other remedy, such as consequential damages caused by a delay in obtaining access to the records, or attorney fees other than those incurred in a proceeding to enforce its provisions.

The Patient Access Law also contains no express language authorizing an award of consequential damages. It provides in relevant part: "Any patient or representative aggrieved by a violation of [Health and Safety Code] Section 123110 may, *in addition to any other remedy provided by law*, bring an action against the health care provider to enforce the obligations prescribed by Section 123110. Any judgment rendered in the action may, in the discretion of the court, include an award of costs and reasonable attorney fees to the prevailing party." (Health & Saf. Code, § 123120, italics added.) Thus, the Patient Access Law contemplates a proceeding to secure access to one's medical records, and a discretionary award of attorney fees and costs to the prevailing party in that proceeding. We do not believe section 123120 authorizes the remedy Maher seeks—an award of prelitigation attorney fees or investigation costs as consequential damages for the failure to timely provide access to medical records. If for no other reason, Maher had a duty to mitigate any such damages by promptly initiating a proceeding to enforce his access rights. He could have promptly applied to the court for an order to show cause why the records should not be produced. (Code Civ. Proc., § 1985.7.) He cannot recover alleged consequential costs that could have been avoided by timely pursuing such a remedy.

For these reasons, we conclude ACMC's demurrer to Maher's medical records cause of action was properly sustained without leave to amend. Maher did not allege facts showing a violation of the Patient Access Law or compensable damages, and there is no reasonable possibility the defects could have been cured by amendment. (*Hernandez v. City of Pomona* (1996) 49 Cal.App.4th 1492, 1498.)

### III. DISPOSITION

The judgments in favor of defendants are reversed. The portion of the trial court's April 25, 2012 order sustaining ACMC's demurrer to Maher's second cause of action without leave to amend is affirmed. Costs on appeal to Maher.

14

_____
Margulies, Acting P.J.

We concur:


_____
Dondero, J.


_____
Banke, J.

15

Trial Court:   Alameda County Superior Court

Trial Judge:   Hon. George C. Hernandez

Counsel:

Law Office of Edward A. Judge, Edward A. Judge; Roubinian Law Group and Leon V. Roubinian for Plaintiff and Appellant.

Andrada & Associates, J. Randall Andrada, Valerie Ly and Teresa Rie Morimoto for Defendant and Respondent County of Alameda.

Galloway, Lucchese, Everson & Picchi, Karen A. Sparks and Martin J. Everson for Defendants and Respondents Alameda County Medical Center and Ralph Bernstein, M.D.

Manning & Kass Ellrod, Ramirez, Trester, Thomas A. Trapani; Oium Reyen & Pryor and Virgil F. Pryor for Defendants and Respondents Lifelong Medical Care–Berkeley Primary Care and Vaneida White, M.D.

Hassard Bonnington, B. Thomas French, Robyn Schanzenback and J. Julia Hansen for Defendant and Respondent Sutter East Bay Hospitals dba Alta Bates Summit Medical Center.