83 N.J. Super. 192 (1964)
199 A.2d 86
FRANCES ROTHMAN AND EDWARD ROTHMAN, PLAINTIFFS,
v.
JOSEPH SILBER, STANLEY GOODMAN AND NEWARK BETH ISRAEL HOSPITAL, A CORPORATION OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided March 26, 1964.
*194 Mr. Ira Waxman argued the cause for plaintiffs (Mr. Samuel March, attorney).
Mr. Melvin B. Cohen argued the cause for defendant Silber (Messrs. Kristeller, Zucker, Lowenstein & Cohen, attorneys).
Mr. Horace G. Davis argued the cause for defendant Goodman (Messrs. Davis & Roth, attorneys).
Mr. Fred W. Jung, Jr. argued the cause for defendant Beth Israel Hospital (Messrs. Jung & Selikoff, attorneys).
YANCEY, J.C.C. (temporarily assigned).
On August 29, 1962 the plaintiffs, Frances Rothman and Edward Rothman, filed a complaint against the defendants, Dr. John Silber, Dr. Stanley Goodman, and Newark Beth Israel Hospital, a corporation of New Jersey. The complaint alleged that the defendants negligently treated the plaintiff, Frances Rothman, so as to seriously and permanently injure her. The defendants, after filing their answers denying the allegations set forth in the complaint, moved "to strike the complaint of the plaintiffs," contending that the personal injuries complained of by Frances Rothman occurred more than two years prior to the institution of the suit and the action is therefore barred by the statute of limitations. The motion came on for hearing on March 15, 1962. On November 30, 1962 the defendants' motion to dismiss was denied without prejudice. The plaintiffs were permitted to file an amended complaint and the defendants were granted the right to renew the motion "to strike" after further discovery proceedings.
Plaintiffs filed their amended complaint in ten counts, five of which allege a per quod cause of action by the husband. Plaintiffs allege: (1) defendants negligently performed certain *195 medical and surgical procedures attendant to the birth of their child; (2) they contracted with plaintiffs to render specialized medical and surgical procedures, but due to their negligence failed to do so and thus breached their contract; (3) they "committed acts of malpractice against the plaintiff" because they improperly left or caused to be left a foreign object or body in the female plaintiff, and (4) they fraudulently concealed the injury inflicted upon said plaintiff.
Defendants, upon receipt of this amended complaint, renewed their motion to strike on the grounds that "the suit is barred by the Statute of Limitations in such cases made and provided." The matter came on for hearing before me and after very carefully examining the depositions and the cases cited in the briefs submitted by counsel for both sides I find that the motion to strike the amended complaint should be denied and for the following reasons.

I.
Plaintiff Frances Rothman was delivered of her third child on March 10, 1960 at the Beth Israel Hospital in Newark, New Jersey. Plaintiff's treating physician, an obstetrician, was defendant Dr. Stanley Goodman. The anesthetist for the delivery was defendant Dr. Joseph Silber. Prior to delivery a saddle block anesthesia was administered. The morning after the delivery plaintiff complained of headaches and pain radiating down the back of her right thigh from the buttock to the knee. Both Dr. Goodman and Dr. Silber were informed of these complaints. They told Mrs. Rothman that she was suffering from the after-effects of childbirth and that the pains and headaches would gradually disappear.
Mrs. Rothman was discharged from the hospital on March 17, 1960. As of that date the pains on her right side had disappeared, but slight headaches remained. "Twinges" of pain on her right side occurred off and on during a period of about one month after her return home. In May or June the pains on her right side recurred with greater severity. Because of *196 this increase in pain, Mrs. Rothman went to see Dr. Emanuel Klosk, a general practitioner. Her first visit was on July 15, 1960. She complained of pain in the right hip, radiating down the back of her right thigh from the buttock to the knee. She also stated to the doctor that she had been delivered of a child about four months prior to his seeing her and had received a saddle block. After her examination by Dr. Klosk, Mrs. Rothman, on August 3, 1960, went to Dr. Philip Willner, an orthopedic surgeon. During the course of the examination Mrs. Rothman informed the doctor that she had had a saddle block administered to her during delivery of her third child, and that she had "very bad pains from my hip down." She claimed that the pain occurred about two months ago.
Mrs. Rothman next saw Dr. Lewis H. Loesser, a neurologist, on August 15, 1960. She gave him the same history that she had previously given to the other physicians, that is, "after the third baby [March 10, 1960] after a saddle block, developed sciatic pain. After two and a half months it came back slowly."
Subsequently Mrs. Rothman, suspecting that she was again pregnant, visited Dr. Arthur S. Buckler, a general practitioner, on November 18, 1960. Dr. Buckler received the same history concerning Mrs. Rothman's past medical episode.
The depositions taken of the doctors mentioned above, with the exception of Dr. Buckler, do not indicate that they professionally diagnosed the case of Mrs. Rothman's condition as having been the result of the administering of the saddle block during the delivery of her child. Not until the visit to Dr. Buckler was the cause of her recurring "twinges" of pain diagnosed as having been possibly caused and related to the saddle block anesthesia administered to Mrs. Rothman on March 10, 1960.

II.
With the above facts before me, I will now apply what I have found to be the applicable law to the instant case. First *197 with reference to the enumerated allegations set forth in the amended complaint, I shall at the outset lay certain of them to rest.
Plaintiffs' first allegation: defendants negligently performed their services. This presents a fact question to be resolved by a jury, and thus I leave plaintiffs to their proofs at the trial. The second allegation: defendants breached their contract. I find the law in New Jersey to be that the statute of limitations, N.J.S. 2A:14-2, applies to actions for personal injuries, regardless of whether they arise out of tort or breach of contract. Burns v. Bethlehem Steel Co., 20 N.J. 37 (1955); Tackling v. Chrysler Corp., 77 N.J. Super. 12 (Law Div. 1962). As to the fourth allegation, I find no evidence from the affidavits which indicates that defendants fraudulently concealed the purported injury from plaintiffs' knowledge.
This leaves the third allegation as the sole ground before the court. The question that arises under this allegation is whether the introduction into the patient's body of a drug or medicine should be differentiated from those cases arising out of surgery in which the patient subsequently discovers foreign substances such as sponges, clamps, tubes, pieces of broken bones and other foreign substances which have been left in his body.

III.
Until recently our courts followed the rule with regard to foreign substances stated in Weinstein v. Blanchard, 109 N.J.L. 332 (E. & A. 1932) (referred to in 144 A.L.R., at p. 210), under which the statute of limitations ordinarily runs against the physician or surgeon for damages due to malpractice from the time of the act of negligence or unskillful treatment and not from the time of the consequential injury. The court pointed out that in the application of this rule the mere fact that treatment follows or continues after a single act of negligence or breach of duty, or that the confidential relationship of patient and physician continues thereafter *198 does not postpone the running of the statute unless the physician or surgeon has been guilty of fraudulent concealment. See also Tortorello v. Reinfeld, 6 N.J. 58 (1950); Bauer v. Bowen, 63 N.J. Super. 225 (App. Div. 1960); Biglioli v. Durotest Corp., 44 N.J. Super. 93 (App. Div. 1957), affirmed 26 N.J. 33 (1958), 80 A.L.R.2d 368 (1961).
The above rule prevailed in this State until the decision in Fernandi v. Strully, 35 N.J. 434 (1961). In that case a claim was asserted against a surgeon for negligence in performing an operation on his patient on April 26, 1955 at which time he left a foreign object in her body after closing the incision. The patient did not gain knowledge of this until more than two years after the operation had been performed. The court held, on the particular facts in that case, that the cause of action did not accrue until the plaintiff knew or had reason to know about the foreign object and the existence of a cause of action based upon its presence in her body. The court treated the claim as within a "special grouping or `class of cases,'" noting that the lapse of time did not entail the danger of a false or frivolous claim nor the danger of a speculative or uncertain claim.

IV.
The present case presents a novel question  whether the claim asserted by plaintiffs should be treated as within a "special grouping" or "class of cases" within the rule expounded by the Fernandi case, supra. My independent research of the cases on the subject in New Jersey has not uncovered an analogous case, nor have counsel for either side cited any case from this jurisdiction as being in point.
A research of the law of our sister states has uncovered the following. In the case of O'Hare v. Petersen, 174 Misc. 481, 21 N.Y.S.2d 487 (Munic. Ct. 1940), the New York court defined a foreign substance to be: "Not organically connected or naturally related. A substance occurring in any part of the body or organism where it is not normally found. Usually introduced from without." (Merriam Webster Dictionary, *199 2d ed.) This definition was also used in Adams v. Great Atlantic & Pacific Tea Co., 251 N.C. 565, 112 S.E.2d 92 (Sup. Ct. 1960). 36A C.J.S., Foreign, p. 1093 (1961).
An anesthesia is defined as the induced loss of sensation prior to a medical or dental operation or treatment, having the purpose of avoiding pain during that treatment. The comparatively recent development of anesthesia by way of "spinal block," that is, by desensitizing the nerve roots at the point they reach the spine, has given rise to a number of cases in which it has been charged, with varying degrees of success, that the anesthetist was guilty of negligently administering the anesthetic in such a manner as permanently to injure the major nerves and thus cause paralysis. Cases concerning the question of an anesthetist's liability for paralysis which developed following the giving of a spinal anesthetic are collected in 53 A.L.R.2d sec. 7, p. 159. See also Ayers v. Parry, 192 F.2d 181 (3 Cir. 1951).
Under the above definitions, can the saddle block anesthesia be considered as a "substance" or foreign object "not organically connected or naturally related" to the body, even though it was "introduced from without" for the intended medical purpose of relieving the patient's pain? Is it a "substance" or foreign object because the drug "wears off" and dissipates into the person's system at the end of a certain period of time, leaving nothing tangible remaining in the body?

V.
It is the settled law of California that where the one-year statute of limitations relating to tort actions is applicable, the statutory period does not start to run until the time that plaintiff discovers, or by the exercise of reasonable care should have discovered, the injury resulting from defendant's wrongful act. The rule is applicable, not only to cases arising out of surgery, in which the patient subsequently discovers foreign substances left in his body, but applies equally to cases in which a physician's negligence is predicated upon the *200 administration or introduction into the patient's body of a drug or medicine. The California court extended this "foreign object" theory to cases where there was an administration or introduction in the patient's body of a drug or medicine in the case of Agnew v. Larson, 82 Cal. App.2d 176, 185 P.2d 851 (D. Ct. App. 1947).
In Agnew defendant Larson was employed on January 27, 1942 by plaintiff as her physician for the purpose of examining her physical condition and prescribing medical treatment or medication therefor. He treated her on numerous occasions, the treatments lasting until June 1, 1943. The treatment prescribed by defendant required the plaintiff to take a substantial quantity of medicine consisting of stilbestrol in tablet form. Plaintiff took the prescribed tablets as directed by the defendant. About July 17, 1944 plaintiff had another physician, Dr. Wilson, examine her. This physician also directed her to take tablets of stilbestrol and to continue taking them. On or about January 15, 1945, while plaintiff was under the care and treatment of both physicians, a lump developed in plaintiff's right breast which laboratory tests on February 8, 1945 disclosed to be cancer. On February 10, 1945 plaintiff was required to submit to the removal by surgery of her right breast in order to prevent the cancer from spreading.
On January 15, 1946 plaintiff filed a complaint against both physicians, contending that the taking by her of such medicine over the prolonged period, coupled with her physical condition and her family history of breast cancer, caused her cancerous condition. She claimed that defendants, having knowledge of these facts, failed to possess or exercise that degree of skill and learning ordinarily possessed and exercised by other skillful physicians practicing in that locale, and as a proximate result of their negligence she suffered this cancerous condition and damage.
Defendants filed demurrers predicated on two grounds. One, the insufficiency of the complaint to state a cause of action against them, and two, the complaint was barred by *201 the statute of limitations, subdivision 3, section 340, Code of Civil Procedure. Defendant Larson's demurrer was sustained. Defendant Willson's general demurrer was overruled. Plaintiff appealed from a judgment of dismissal. On appeal the District Court of Appeals reversed the judgment of dismissal. In the opinion Judge Kincaid reasoned as follows:
"The nature or character of the foreign substance or matter introduced into the body of the patient by the physician is immaterial. The physician is charged with knowledge and foresight, to the degree of learning and skill possessed by physicians of good standing practicing in the same locality (McCurdy v. Hatfield, 30 Cal.2d 492, 183 P.2d 269), of both the nature and effect of such foreign substance or matter upon the patient and, where injury proximately results from the negligent act of the physician and the patient has relied upon him for information as to his physical condition as well as for the results that may reasonably be anticipated from the introduction into his body of the foreign substance or matter, including drugs and medicines, the statute of limitations does not commence to run until the patient knows, or in the exercise of ordinary care should have known, the cause of his injury." (185 P.2d, at p. 854.)
Another case where the court held that the statute of limitations does not commence to run until the plaintiff discovers his injury was due to defendant's wrongful act, or through the exercise of reasonable diligence should have discovered it is Garlock v. Cole, 199 Cal. App.2d 11, 18 Cal. Rptr. 393 (D. Ct. App. 1962). In Garlock a patient brought a malpractice action against two physicians. The patient suffering from herpes zoster (shingles) was given an injection as treatment for cure of the disease. Within 10 or 15 minutes after the injection he experienced a burning sensation in his arm, which resulted in his arm and three fingers and the thumb of his left hand becoming numb and partially paralyzed. In California, as was said, one-year statute of limitations governs malpractice actions. The patient did not commence his action until approximately one year and five months later. The District Court of Appeals of California held that the physicians were not entitled to summary judgment, on the ground that the action was barred by the one-year statute of limitations. The court concluded, inter alia:
*202 "[T]he statute does not commence to run until the plaintiff discovers his injury due to defendant's wrongful act or through the exercise of reasonable diligence should have discovered it. (Huysman v. Kirsch, 6 Cal.2d 302, 57 P.2d 908.) Actual or constructive notice not only of the condition but of its negligent cause and deleterious effect is implicit in this definition."
In Ayers v. Morgan, 397 Pa. 282, 154 A.2d 788 (Sup. Ct. 1959), Justice Musmanno stated:
"* * * [T]he negligence charged was not in the use of the sponge but the failure to remove it at the proper time. * * * An operation is not completed until a surgeon takes away the tools with which he operates. * * * The injury became a reality when the sponge began to break down healthful tissues within the body of the plaintiff. * * * [K]nowledge [was] is impossible because of the laws of nature."

VI.
The situation under consideration presents a patient who suffered an apparent injury while unconscious and in the care and custody of defendants. The statements made by the physicians in the depositions infer that plaintiff's condition was possibly connected and produced by the spinal anesthesia. This anesthesia, it is alleged by plaintiff, produced an inflammation about the spinal cord that constricts and damages the nerves, and this "breakdown" occurs due to some unusual reaction on the part of the patient to that solution.
Defendants contend that a medication injected into the body intentionally is not a "foreign object," since it was intended to be used as it was used. They assert that if the particular medication used was not appropriate, or if it was improperly administered, this may constitute poor judgment on the part of the physician and may even constitute negligence, but in no sense is this the introduction and leaving of a "foreign object" within the female plaintiff's body.
To support this proposition, defendants cite Fernandi v. Strully, supra. Their interpretation of that case is that the Supreme Court "merely held that in such cases the period of limitations was not to commence until the plaintiff knew or *203 should have known about the foreign object and the cause of the action based on its presence. The Supreme Court in no way intended to abrogate the general rule and prevent its application in those situations which were without the scope of the new exception which it was carving out." I do not agree with the limited interpretation of defendants.
First, the Supreme Court did not have before it the question of what constitutes a foreign object left in the body, but only a particular set of facts presented in that case, the leaving of a "wing nut" in plaintiff's body. Second, the majority opinion as well as the dissent was more concerned with the effect of the decision's opening a "Pandora's Box" of false or frivolous claims and the danger of "speculative or uncertain claims."
I am not persuaded that my interpretation of what constitutes a "foreign object" is inconsistent with the majority opinion in the Fernandi case, or an unwarranted extension of that opinion. I am in accord with the opinion of Judge Kincaid in Agnew v. Larson, supra: "The nature or character of the foreign substance or matter introduced into the body of the patient by the physician is immaterial." A "foreign substance" includes drugs and medicines which are introduced into the body and which are not organically connected or naturally related. These "foreign objects" are any substance occurring in any part of the body or organism where it is not normally found and where it has been introduced from without.
The physician, in using an anesthetic which is injected into the body to induce loss of sensation prior to an operation, is charged with knowledge and foresight to the degree of learning and skill possessed by practicing physicians. He is charged with knowledge of both the nature and effect of such foreign substance or matter upon the patient.
In the instant case plaintiffs' amended complaint alleges facts showing that the female plaintiff first discovered the bodily injury, accruing to her as a proximate result of the alleged negligent acts or omissions of defendants, on November *204 18, 1960. Until that time she did not know the cause of her "twinging" sensation. Nor did she sit back and not attempt to discover the reason for her pain. The fact is, she did exercise ordinary care in attempting to learn the source of her affliction by visiting various doctors and submitting to their examinations. Not until she was examined on November 18, 1960 did she discover, after having been told by a physician, that the injury was due to defendants' alleged wrongful act.
I therefore find that the cause of action did not accrue until that time, and that the complaint filed on August 29, 1962 is not barred by the statute of limitations. It necessarily follows that plaintiff husband's per quod claim is also not barred.

VII.
Finally, defendants contend that the affidavits submitted by plaintiffs are insufficient to oppose their motion for summary judgment.
Summary judgment procedure is designed to provide a prompt, businesslike and inexpensive method of disposing of a cause. The papers supporting the motion are to be closely scrutinized and the opposing papers indulgently treated. All inferences of doubt are to be drawn against the movant in favor of the opponent of the motion. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67 (1954). Only where no genuine issue of material fact is present should the motion be determined on the applicable law. New Jersey Mortgage and Inv. Corp. v. Calvetti, 68 N.J. Super. 18 (App. Div. 1961).
After closely scrutinizing the papers supporting the motion and indulgently treating the opposing affidavits submitted by defendants, I find that there exist sufficient palpable issues of fact and, therefore, defendants' motion is denied.
Submit appropriate order.