Evelyn Rodriguez et al., Appellants, v Manhattan Medical Group, P. C., et al., Respondents.

First Department, March 27, 1990

## APPEARANCES OF COUNSEL

*William Kirchhofer* of counsel *(Glatzer, Belovin & Kirchhofer, P. C.,* attorneys), for appellants.

*Thomas S. Nogaro* of counsel *(Jeffrey D. Karan* with him on the brief; *Michael Saunders,* attorney), for respondents.

### OPINION OF THE COURT

WALLACH, J.

In "The Doctor in Spite of Himself", Moliere has his imposter-physician place his ear trumpet on the right side of the patient's chest, and, when the latter objects that his heart is on the left side, the "doctor" pompously pronounces his grave professional judgment: "We have changed all that." What the great French playwright is telling us is that the encounter between doctor and patient is at best a chancy and uncertain thing. But we should not undertake to add to that uncertainty by adopting an expansive "foreign object" rule which leaves to purely fortuitous circumstances the duration of the doctor's liability for a diagnostic error.

The facts in this medical malpractice action are stated in the dissenting opinion, which would hold that the IUD involved here, although a "fixation device" upon insertion in plaintiff patient's body, and thus by definition not a foreign object under CPLR 214-a, was transformed into a foreign object by reason of defendant doctor's negligent failure to detect its displaced presence after plaintiff came under his care specifically in order to have it removed. While there is respectable authority, cited by the dissent, for that approach, we are not bound thereby, and chose not to follow it since accrual of the Statute of Limitations should not depend on the chance circumstance that the malpractice alleged happens to involve an unwanted or unneeded fixation device.

Suppose Dr. A examines a patient and negligently fails to discover a malignant tumor. Under CPLR 214-a, his liability for that mistaken diagnosis would be barred upon the expiration of 2 years and 6 months measured from the time of the misdiagnosis *(Schiffman v Hospital for Joint Diseases,* 36 AD2d 31 [2d Dept]). Suppose further that simultaneously in an adjacent examination room, Dr. B negligently fails to discover an IUD device previously inserted in the patient several years earlier by another doctor. According to the dissent, his liability is open-ended, only terminating one year after the patient discovers, or should have discovered, the error. As we see it, the negligence of both these doctors is the same, namely, one of misdiagnosis, and ought to be treated the same, notwithstanding that the IUD might in common parlance be consid-

ered "foreign" to the body and the tumor not *(cf., Matter of Soto v Greenpoint Hosp.,* 76 AD2d 928 [2d Dept] [toy lodged in infant plaintiff's throat not detected by doctor; *held,* toy not a foreign object. *Query:* is the toy less foreign to the body than the IUD, or is it that the exception to the foreign object exception urged by the dissent applies only to fixation devices?]). Similarly, in cases of mistreatment, why should the foreign object rule apply when a doctor negligently fails to remove an IUD after undertaking to do so *(e.g., Sternberg v Gardstein,* 120 AD2d 93 [2d Dept]; *Ooft v City of New York,* 80 AD2d 888 [2d Dept]), but not apply when a doctor negligently fails to remove a tumor after undertaking to do so *(e.g., Florio v Cook,* 65 AD2d 548, 549 [2d Dept], *affd* 48 NY2d 792; *see also, Famulare v Huntington Hosp.,* 78 AD2d 547 [2d Dept])? Such cases, all decided by the Second Department, are not easy to reconcile *(see,* McLaughlin, 1981 Supp Practice Commentaries, 1990 Supp Pamph, McKinney's Cons Laws of NY, Book 7B, CPLR 214-a, at 311).

*Flanagan v Mount Eden Gen. Hosp.* (24 NY2d 427), in creating the foreign object exception to the general time of commission accrual rule, expressly excluded from the scope of the exception claims implicating "professional diagnostic judgment or discretion" (at 431). Such being the nature of the alleged malpractice here, the claim does not fit within the exception. Whether the *Flanagan* exception, narrow as it is, strikes a proper balance between the patient's interest in compensation and the doctor's interest in repose is essentially a question of public policy inappropriate for consideration by an intermediate appellate court; "grim logic" though it may be to say that a patient must commence an action before she even knows she has one to commence *(see,* McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C214:6, at 434), it is not for us "to depart further from the traditional view of the Statute of Limitations than *Flanagan* sanctions" *(Schiffman v Hospital for Joint Diseases,* 36 AD2d, *supra,* at 33). All the more should we hesitate to depart further from the traditional view, considering that the Court of Appeals has twice taken occasion to say that the Legislature, in codifying the foreign object exception in the manner in which it did, has expressed an intent that it "not be broadened beyond its existing [i.e., *Flanagan]* confines". *(Goldsmith v Howmedica, Inc.,* 67 NY2d 120, 123; *Matter of Beary v City of Rye,* 44 NY2d 398, 415.)

Accordingly, the order of the Supreme Court, New York

County (Michael J. Dontzin, J.), entered January 9, 1989, which dismissed the action as barred by the Statute of Limitations, should be affirmed, without costs.

CARRO, J. (dissenting). I respectfully dissent and would reverse the order of Supreme Court, reinstate the complaint and grant plaintiffs' motion to dismiss the defendants' affirmative defense raising a claim that the Statute of Limitations has expired.

This case presents us with the question of whether an intrauterine device (IUD), which had been intentionally inserted into plaintiff's body by a nonparty, was transformed into a foreign object, by reason of defendants' failure to remove it upon plaintiff's request, and therefore subject, under CPLR 214-a, to the foreign object exception to the Statute of Limitations in a medical malpractice case.

The facts are not in dispute. In 1980, plaintiff Rodriguez had a Copper 7 (CU-7) IUD inserted into her uterus by a physician who is not a party to this action. In January 1982, plaintiff came under the care of defendant Manhattan Medical Group (Medical Group). Later that year, plaintiff and her husband decided to have the IUD removed so that they could have children; plaintiff stated that she wanted to give her son Carlos a brother or a sister.[1]

On or about November 5, 1982, plaintiff was examined by defendant Dr. Klein, an employee of the Medical Group. Klein conducted an internal examination of plaintiff and, when he did not detect the IUD, ordered X rays of plaintiff's lower abdomen. Klein reported, after the X ray was conducted, that "no intrauterine device is noted in the central portion of the pelvic cavity."

On December 17, 1982, plaintiff returned to the Medical Group and was informed by Klein that no IUD was detected by the X rays and that she could attempt to become pregnant. The records of the Medical Group for that date bore the notation, "no evidence of IUD in pelvis or abdomen. Plan *[sic]* will attempt pregnancy." Although plaintiff tried to conceive, her efforts were fruitless.

In April 1986, plaintiff began to experience heavy, intermittent vaginal bleeding, which continued for several months. On July 24, 1986, plaintiff sought medical treatment from Dr.

---

1. The record also reflects that plaintiff's husband, plaintiff Fuentes, has fathered three daughters, whom plaintiff is not the mother of.

George Radney, who performed a sonogram. The sonogram revealed that the subject IUD was not only present, but was, in fact, embedded in the wall of plaintiff's uterus. Plaintiff had to be admitted to St. Luke's/Roosevelt Hospital for surgical removal of the IUD. Among the postoperative findings was the notation that no string from the IUD was visible in the cervix.

Seven months later, plaintiff commenced the instant medical malpractice action. Defendants asserted the affirmative defense that the action was not brought within the applicable Statute of Limitations. Plaintiffs moved to strike the affirmative defense raised; defendants cross-moved for dismissal of the action based on an untimely action filed after the Statute of Limitations ran.

Although the IAS court granted defendants' cross motion for dismissal, it unequivocally acknowledged, "[i]t's true that [plaintiff] had no way of knowing that the IUD was there until five years [sic] later when she began to have some physical problems and then a sonogram revealed the device." The court added that the "only" basis upon which it was dismissing plaintiffs' action, "absent a * * * First Department ruling," was its belief that it was "constrained to follow the ruling of a sister Appellate Division which has ruled on the subject," referring to the Second Department decision in *Sternberg v Gardstein* (120 AD2d 93).

The instant appeal followed.

While the IAS court purported to rely upon *Sternberg v Gardstein* (120 AD2d 93, *supra),* an examination of the record, and close reading of *Sternberg,* show that it in fact supports plaintiffs' position and that the court's ruling resulted from a faulty reading of the case. In *Sternberg,* the Second Department applied the foreign object doctrine where defendant failed to remove an IUD from the plaintiff's body after performing an abortion and tubal ligation. The court held that since the defendant "provid[ed] an alternate means of contraception * * * [and] was to remove the plaintiff's IUD[,] * * * the IUD 'became, or took on the character of, a "foreign object" ' ". *(Sternberg v Gardstein, supra,* 120 AD2d, at 97.) Thus, while the IAS court correctly cited *Sternberg* for the proposition that an implanted IUD is a fixation device *(Sternberg v Gardstein,* 120 AD2d, at 96), it ignored the critical portion of the analysis in *Sternberg,* which unequivocally held that an IUD can be transformed into a foreign object "as contemplated by CPLR 214-a and the case law". *(Supra,* at 97.)

However, as correctly noted by the IAS court, the case herein does indeed present a question of first impression in this Department, regarding whether the subject IUD constituted a foreign object for the purpose of invoking CPLR 214-a, pursuant to which a medical malpractice action, based upon the discovery of a foreign object found in the plaintiff's body, may be commenced within one year of the date of the discovery of the object, or of the date of discovery of facts which would reasonably lead to such discovery. While the general rule ordinarily requires a cause of action sounding in medical malpractice to be brought within 2½ years "of the act, omission or failure complained of" (CPLR 214-a), the "foreign object" exception embodies the *Flanagan* rule set forth by the New York Court of Appeals. *(Flanagan v Mount Eden Gen. Hosp.,* 24 NY2d 427 [1969]; *see,* Siegel, NY Prac § 42.) For the "foreign object" rule to be invoked, the following factors must be met: (1) an act of malpractice of an internal nature such that there exists extreme difficulty in discovering the wrong; (2) the lack of questions implicating the physician's diagnostic judgment or discretion; (3) the absence of the danger of frivolous or false claims; and (4) objective evidence that the malpractice action arises solely from the presence of the subject object. *(Flanagan v Mount Eden Gen. Hosp., supra,* 24 NY2d, at 431.)

In recent years, holdings of numerous courts have suggested that under varying circumstances, an IUD may be deemed to be a "foreign object". *(See,* Carlisle, *Civil Practice,* 39 Syracuse L Rev 75, 125.) These decisions carve out an exception within the exception—that once an IUD has " 'no function to perform, no longer belonged in the body, and should have been removed'," the IUD becomes a foreign object *(Sternberg v Gardstein,* 120 AD2d 93, 96 [2d Dept 1986]) despite the fact that "[i]nasmuch as an IUD is fixed within the woman's body it would seem to fall within the definition of a 'fixation device' and, therefore, not be classifiable as a 'foreign object' to which the *Flanagan* discovery rule applies." *(Darragh v County of Nassau,* 91 Misc 2d 53, 54 [Sup Ct, Nassau County 1977] [holding that where an IUD was to be removed and was left in the body when a second IUD inserted, the first IUD, which defendant failed to remove and therefore no longer served any contraceptive purpose, became a foreign object].) The underlying rationale employed in creating what may be referred to as the "IUD foreign object exception", as stated by the Idaho Court of Appeals, is that: "If an I.U.D. is negligently left in

the body * * * the I.U.D. is no longer deliberately or intentionally within the body. * * * Its continued presence in the body may, as here, become medically contraindicated. Under these circumstances * * * the I.U.D. then becomes a foreign object". *(Ogle v De Sano,* 107 Idaho 872, 876, 693 P2d 1074, 1078 [1984].)* Thus, as a result of the physician's conduct, an IUD may be transformed from an intentionally placed fixation device to a negligently retained foreign object.

Here, the change of status occurred when Klein, upon examining plaintiff without detecting the IUD, ordered the X ray, conducted so as to locate and remove the IUD, if present, to enable plaintiff to conceive. *(See, Sternberg v Gardstein,* 120 AD2d 93, *supra* [IUD became foreign object when defendants provided alternate means of birth control by sterilization]; *accord, Mayotte v Bauer,* 130 Misc 2d 946, 948 [Sup Ct, Onondaga County 1986]; *see also, Taddeucci v Weitzner,* 130 Misc 2d 853, 856 [Sup Ct, Queens County 1986] [where physician informed patient that IUD had been expelled or removed and prescribed oral contraceptives]; *Darragh v County of Nassau,* 91 Misc 2d 53, *supra* [second IUD inserted without removing first]; *accord, Ooft v City of New York,* 104 Misc 2d 879, 881, *mod on other grounds* 80 AD2d 888 [2d Dept 1981].)

However, a change in birth control methods is not, as defendants argue, the only way a change in status can occur. In *Beatman v Gates* (36 Ohio App 3d 114, 521 NE2d 521, 523 [1987]), the court applied the foreign object doctrine where plaintiff gave birth to several children between the failure of the physician to locate the IUD and the onset of abdominal pain which led to the discovery of the IUD.

Moreover, there is authority for holding that the foreign object rule should be applied where, as here, after a physician failed to locate an IUD and reported to the patient that it was no longer present, the IUD was discovered, several years later, in the patient's body. In *Newberry v Tarvin* (594 SW2d 204, 205 [Tex Civ App 1980]) defendant, who had inserted the IUD, was subsequently asked to remove it. Upon conducting a dilation and curettage (D & C), he told plaintiff he did not locate the IUD, and that she should have X rays taken for the purpose of locating the IUD. Shortly thereafter, defendant told plaintiff the X rays were not necessary because the IUD had somehow been expelled. Over 2½ years later, upon complaint of abdominal pains and other symptoms, the IUD was discovered to be in plaintiff's abdomen.

The court, noting that the action could *not* be based upon misdiagnosis, applied the foreign object rule. It held that "plaintiff's cause of action accrued when the nature of her injury was discovered by her, or, in the exercise of reasonable care should have been discovered by her, rather than upon the date of the operation, or upon the date of the alleged wrongful acts and omissions causing her injury." *(Newberry v Tarvin, supra,* 594 SW2d, at 206.) Furthermore, the court held that although plaintiff was aware of internal pain for two years prior to filing suit, such proof did not establish as a matter of law that plaintiff knew, or should have known, that her pain was caused by or associated with the presence of the IUD.

Similarly, in the instant case, there is no evidence to indicate that plaintiff knew or should have known of the presence of the IUD which was embedded in her uterine wall, until the sonogram revealed its presence. Any argument that she should have been alerted by her apparent lack of fecundity is twice refuted. First, her reliance upon the X ray was, under the circumstances herein, totally reasonable. Second, there is no evidence that plaintiffs had reason to believe that any fertility counseling or treatment was necessary, given that they both had previously produced children. Furthermore, defendants' argument that summary judgment was properly granted because the IUD was implanted by another physician, relying upon the local court ruling in *Dunaway v Ball* (116 Misc 2d 409 [Sup Ct, Jefferson County 1982]) is totally unavailing because, as defendants must concede, plaintiff went to defendants *specifically* to have the IUD removed. *(See, Sternberg v Gardstein,* 120 AD2d 93, 97, *supra.)*

Clearly, the IAS court granted defendants summary judgment solely because it incorrectly, albeit in good faith, believed itself constrained to do so under its reading of *Sternberg (supra).* However, the court misread *Sternberg* and, in any event, contrary to the conclusion of the majority, this case falls squarely within the foreign object doctrine. *(Cf., Goldsmith v Howmedica, Inc.,* 67 NY2d 120, 122-123 [1986]; *Matter of Beary v City of Rye,* 44 NY2d 398 [1978].)[2]

MURPHY, P. J., and KASSAL, J., concur with WALLACH, J.;

---

2. These cases, cited by the majority, are distinguishable from the case herein. In *Goldsmith v Howmedica, Inc.* (67 NY2d 120), where a total hip implant broke, plaintiffs did not raise either the foreign object or the continuous treatment exception to the medical malpractice Statute of Limitations (CPLR 214-a). Indeed, plaintiffs' unsuccessful argument in that case was that the courts were creating "a third exception [to the Statute of

KUPFERMAN and CARRO, JJ., dissent in an opinion by CARRO, J.

Order, Supreme Court, New York County, entered on January 9, 1989, affirmed, without costs and without disbursements.

---

Limitations] because [the Court of Appeals] allowed the assertion of a claim [of products liability] against the manufacturers of prosthetic devices within three years of injury even though the devices had been implanted years earlier." *(Goldsmith v Howmedica, Inc., supra,* 67 NY2d, at 123.) In *Matter of Beary v City of Rye* (44 NY2d 398), which consolidated five cases, two of the actions, *Matter of Smalls v New York City Health & Hosps. Corp.* and *Merced v New York City Health & Hosps. Corp.,* regarded and were held to be excluded from the foreign object doctrine. In *Smalls,* the Court of Appeals held that the internal somatic side effects of a myelogram was not a situation which involved a foreign object. *(Matter of Beary v City of Rye,* 44 NY2d 398, 409, 411, *supra.)* In *Merced,* the court held that the foreign object exception could not be applied where plaintiff, following a sterilization procedure performed by defendants, subsequently had an ectopic pregnancy in one of the fallopian tubes which was supposed to have been occluded by the surgery, because the foreign object doctrine is inapplicable to objects "on whose *absence* it is premised [so as not to be] *present* and therefore able to 'retain its identity' so that no 'possible causal break between the negligence of the doctor or hospital and the patient's injury' could occur." *(Matter of Beary v City of Rye,* 44 NY2d 398, 414, *supra.)*