#25420-a-SLZ

**2010 S.D. 76**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

ANNE SCHMIEDT and
DARIN SCHMIEDT,                                        Plaintiffs and Appellants,

    v.

NATHAN H. LOEWEN, M.D.,                               Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE THIRD JUDICIAL CIRCUIT
BEADLE COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE JON R. ERICKSON
Judge

\* \* \* \*

ROGER R. GERLACH
Salem, South Dakota

MICHAEL E. UNKE                                        Attorneys for plaintiffs
Salem, South Dakota                                    and appellants.

JEFF L. BRATKIEWICZ
KATHRYN J. HOSKINS of
Siegel, Barnett & Schutz                               Attorneys for defendant
Sioux Falls, South Dakota                              and appellee.

\* \* \* \*

ARGUED ON APRIL 28, 2010

OPINION FILED **09/22/10**

#25420

ZINTER, Justice

[¶1.]     Anne and Darin Schmiedt sued Dr. Nathan Loewen for medical malpractice arising out of complications following the placement of an intrauterine device (IUD). Dr. Loewen moved for summary judgment, arguing that the statute of limitations had expired. Schmiedts argued that their action was timely because: the IUD was a "foreign object"; their claim fell within the continuing tort doctrine; and under the continuing tort doctrine, the statute of limitations did not begin to run until the IUD was removed. The circuit court granted summary judgment in favor of Dr. Loewen, concluding that the continuing tort doctrine was inapplicable. We affirm the circuit court's judgment, but we do so for a different reason. We conclude that the continuing tort doctrine applied. Nevertheless, Schmiedts' cause of action was barred because they acquired actual knowledge of the foreign object yet failed to commence their action within two years of their discovery.

*Facts and Procedural History*

[¶2.]     The material facts are undisputed. To the extent other facts are disputed, we restate them in a light most favorable to Schmiedts. Dr. Loewen, a family practitioner, implanted Anne's IUD on July 27, 2004. According to the literature that Dr. Loewen provided to Anne, migration of an IUD was a known risk. The literature warned that if the IUD migrated from the endometrial cavity, it would not protect against pregnancy and should be removed. The literature also warned that if the IUD migrated and perforated the uterine wall, infection, scarring, and other damage to organs could occur.

#25420

[¶3.]      On October 22, 2004, Anne returned to Dr. Loewen, advising him that she could no longer feel the threads attached to the IUD, an indication of possible migration.  Dr. Loewen performed a pelvic exam.  He could not locate the IUD and was concerned that it may have fallen out or moved.  Dr. Loewen performed a transvaginal ultrasound and ordered a pelvic x-ray.  The x-ray revealed that the IUD was still in Anne's endometrial cavity, but it had moved and become deformed.  For purposes of summary judgment, Dr. Loewen conceded that he did not report these findings to Anne.[1]  Dr. Loewen only disclosed that if Anne wanted more children, the IUD would have to be surgically removed.

[¶4.]      Anne saw Dr. Loewen four additional times from February 2005 through January 2006.  During those visits, she complained of cramping, heavy menstruation, and abdominal pain.  Although Anne asked Dr. Loewen about the IUD, he did not disclose the abnormal findings.  He further indicated that the IUD was doing its job.[2]

[¶5.]      On March 30, 2006, a home pregnancy test indicated that Anne was pregnant, and on April 3, 2006, she returned to Dr. Loewen.  Dr. Loewen performed

---

1.      At his deposition, Dr. Loewen described a different version of what occurred.  He testified that during the October 22, 2004 visit, he disclosed that the IUD "was not ideally placed."  He also testified that he discussed the possibility of removing the IUD.  He testified that after their discussion "the decision that was decided" was not to surgically remove the IUD at that time.  He conceded, however, that this discussion was not documented in his medical notes.  For purposes of summary judgment, we accept Schmiedts' version of Dr. Loewen's disclosures.

2.      During the June 21, 2005 visit, Dr. Loewen ordered an abdominal ultrasound.  He did not disclose its findings to Anne.

a transvaginal ultrasound, but could not locate the IUD. Anne did not return to Dr. Loewen after the April 3, 2006 visit.

[¶6.]    The following day, April 4, 2006, Anne saw Dr. Nedved, a gynecologist. Dr. Nedved performed an ultrasound. After getting a second opinion from another gynecologist, both doctors concluded that the IUD had penetrated the uterine wall and migrated into Anne's abdomen.

[¶7.]    There is no dispute that the IUD needed to be removed. Dr. Nedved, however, indicated that it should be left in place until the end of Anne's pregnancy because of the risk of miscarriage or injury to the unborn child. Anne delivered her baby on November 28, 2006. Although the surgery to remove the IUD was scheduled to occur immediately after the birth, a difficult delivery further postponed the procedure. On January 31, 2007, approximately one month before the rescheduled surgery, Anne passed the IUD rectally.

[¶8.]    On August 18, 2008, more than two years after the gynecologists informed Anne that the IUD had migrated into her abdomen and needed to be removed, Schmiedts sued Dr. Loewen for malpractice. Schmiedts alleged that Dr. Loewen was negligent in failing to inform Anne of her test results and in failing to remove the IUD or to recognize that the IUD had migrated. Dr. Loewen moved for summary judgment based on SDCL 15-2-14.1, a two-year statute of limitations. The circuit court granted summary judgment, concluding that the continuing tort doctrine was inapplicable because "the negligence was not the failure to remove the IUD, but rather [its] placement."

*Decision*

[¶9.]    Schmiedts argue that the circuit court erred in focusing on the time of Dr. Loewen's placement of the IUD.  Schmiedts contend the IUD became a foreign object that should have been disclosed or removed when its movement was discovered by Dr. Loewen.  They further contend that because the migrated IUD was not disclosed or removed, Anne suffered a continuing tort that delayed the running of the statute of limitations until the IUD's passage on January 31, 2007.  Dr. Loewen contends that the IUD's status as a foreign object is irrelevant because the continuing treatment doctrine controls.  Under the continuing treatment doctrine, Dr. Loewen contends that Schmiedts' cause of action began to run when the doctor-patient relationship ended on April 3, 2006.

[¶10.]    "Summary judgment is proper on statute of limitations issues only when application of the law is in question, and not when there are remaining issues of material fact."  *Greene v. Morgan, Theeler, Cogley, and Petersen*, 1998 S.D. 16, ¶ 6, 575 N.W.2d 457, 459.  Although there are disputes of fact regarding Dr. Loewen's disclosures, disposition of this case involves legal questions regarding application of the statute of limitations.  We review such legal issues *de novo*.

[¶11.]    South Dakota's medical malpractice statute of limitations provides in relevant part: "An action against a physician . . . for malpractice, error, mistake, or failure to cure, whether based upon contract or tort, can be commenced only within two years after the alleged malpractice, error, mistake, or failure to cure shall have occurred[.]"  SDCL 15-2-14.1.  This is an "occurrence rule."  The cause of action accrues when the alleged negligence occurs, even if the actual injury or harm has

not been discovered. *Beckel v. Gerber*, 1998 S.D. 48, ¶ 9, 578 N.W.2d 574, 576. If, however, the negligence involves a continuing tort involving a continuing injury, the statute of limitations does not begin to run until "the wrong terminates." *Alberts v. Giebink*, 299 N.W.2d 454, 456 (S.D. 1980).

[¶12.]        In *Alberts,* the plaintiff brought suit in 1979 for medical services provided in 1968. A pin had been inserted in the plaintiff's knee in November 1968 and was scheduled to be removed the next month. Although the wires attached to the pin were removed, the plaintiff was not informed that the pin was left in his knee. In January 1979, the plaintiff visited another doctor who informed the plaintiff of the pin in his knee. The pin was immediately removed, and the plaintiff filed suit one year later for failure to remove the pin or inform the plaintiff of its existence. This Court concluded that the action was not barred by the two-year statute of limitations because the negligence was not the physician's insertion of the pin, but rather the failure to inform the patient of the pin's existence and the failure to remove it when it was reasonably and medically necessary to do so. We explained:

> The alleged misconduct here is defendants' failure to remove the . . . pin (which assumes that it was reasonably and medically necessary to do so), and failure to inform plaintiff of its existence. If proven, this failure would constitute a continuing tort. Generally, when a tort involves a continuing injury, the cause of action accrues and the statute of limitations commences *when the wrong terminates.*

*Id.* (emphasis added).

[¶13.]        Schmiedts rely on *Alberts,* arguing that the IUD was a foreign object causing a continuing tort, which delayed the running of the statute of limitations

until the wrong terminated. They further argue that the wrong did not terminate until the IUD passed on January 31, 2007. Dr. Loewen responds that the continuing tort doctrine is "one in the same" and "interchangeable" with the continuing treatment doctrine. Dr. Loewen points out that under the continuing treatment doctrine, although the statute of limitations does not generally run while the patient continues to receive treatment, the statute begins to run when the doctor-patient relationship ends. *See Beckel,* 1998 S.D. 48, ¶ 10, 578 N.W.2d at 576. Dr. Loewen argues that the statute of limitations expired in this case because the doctor-patient relationship ended on April 3, 2006, more than two years before Schmiedts brought suit.

[¶14.]      We do not agree that the continuing tort and continuing treatment doctrines are interchangeable such that the statute of limitations begins to run under both when the doctor-patient relationship terminates. Our analysis in *Beckel* reflects that they are separate doctrines involving potentially different dates upon which the statute of limitations begins to run. In *Beckel,* we stated that the continuing tort theory is "one exception," under which the statute of limitations does not begin to run until the wrong terminates. *Id.* We then observed that "[t]he 'continuing tort' theory was extended to provide for *another* exception known as the 'continuing treatment' rule." *Id.* (emphasis added). And, under that additional exception, the statute of limitations does not begin to run as long as there is "an 'on-going, continuous, developing and dependent relationship.'" *Id* (citing *Bruske v. Hill,* 1997 SD 108, ¶ 15, 567 N.W.2d. 872, 877). Our subsequent, separate application of each doctrine confirmed that the continuing tort and continuing

treatment doctrines are not interchangeable for purposes of determining when a statute of limitations commences to run. We first concluded that the doctor-patient relationship had terminated precluding application of the continuing treatment doctrine. Nevertheless, we also considered whether the action could be timely under the continuing tort doctrine. Thus, the statute of limitations does not necessarily begin to run under both doctrines when the patient-physician relationship terminates. Dr. Loewen's point that the doctor-patient relationship terminated more than two years before filing suit is not dispositive.

[¶15.]        Schmeidts' cause of action concerns Dr. Loewen's alleged "failure to remove the . . . [IUD] . . . and failure to inform [Anne] of its [migration]." *See Alberts,* 299 N.W.2d at 456; *see also Beckel,* 1998 S.D. 48, ¶ 10, 578 N.W.2d at 576. To determine when the statute of limitations began to run, we must first determine whether the IUD was a foreign object that triggered the continuing tort doctrine. *See Beckel,* 1998 S.D. 48, ¶ 14, 578 N.W.2d at 577. If it was, we then must determine how long the continuing tort doctrine delayed the commencement of the statute of limitations.

[¶16.]        In *Beckel* we considered whether a hemoclip was a foreign object triggering the continuing tort doctrine, thereby delaying the commencement of the statute of limitations. We adopted "[t]he general consensus . . . that objects intentionally placed within a body, and with the intention that they remain therein, do not qualify as 'foreign objects' so as to [delay the commencement of] the statute of limitations." *Beckel,* 1998 S.D. 48, ¶ 17, 578 N.W.2d at 577 (concluding that "[a] fixation device . . . intentionally placed in the body and not left there in the course of

some later procedure in which it should have been removed, does not constitute a 'foreign object'") (citing *Rockefeller v. Moront*, 81 N.Y.2d 560, 601 N.Y.S.2d 86, 89, 618 N.E.2d 119, 122 (1993)). We concluded that "whether the [object] was to be removed is relevant and is a critical distinction." *Id.*

[¶17.]     An IUD's status as a foreign object is not readily apparent because an IUD is intentionally placed in a woman's body but is removed when its birth control function is no longer desired or it becomes medically necessary. Therefore, "[n]ormally, an I.U.D. *in situ,* will not be considered a foreign object." O*gle v. De Sano*, 107 Idaho 872, 876, 693 P.2d 1074, 1078 (Ct.App. 1984). On the other hand,

> If an I.U.D. is negligently left in the body, after the surgeon represents to the patient that it has been removed, the I.U.D. is no longer deliberately or intentionally within the body. It is inadvertently or unintentionally *left* in the body. . . . Under these circumstances . . . the I.U.D. then *becomes* a foreign object[.]

*Id.* (second emphasis added). Other courts follow this analysis when removal is medically necessary. *See Beatman v. Gates*, 36 Ohio App. 3d 114, 116, 521 N.E.2d 521, 523 (1987) (concluding that summary judgment was inappropriate because the IUD could become a foreign object if it repositioned itself within the body and the physician failed to inform the patient of that occurrence). *Beatman* noted that at that point, an IUD has no further function to perform and no longer belongs in the patient's body. *Id.* "Certainly the device [is] not performing any birth control chemistry in the appellant's abdominal cavity[.]" *Id. See also Newberry v. Tarvin*, 594 S.W.2d 204, 206 (Tex.Civ.App. 1980) (concluding that an IUD, which became lost in the patient's body necessitating surgery to locate and remove, was considered a foreign object). *But see Rodriguez v. Manhattan Med. Group*, 155 A.D.2d 114, 115-

16, 552 N.Y.S.2d 947, 948 (App.Div. 1990) (concluding that a "fixation device," such as an IUD, is not transformed into a "foreign object" when a physician fails to remove it after being retained to do so).

[¶18.]    In this case, the IUD allegedly deformed and migrated into Anne's abdomen while she was in Dr. Loewen's care. Schmiedts' complaint alleges that Dr. Loewen failed to inform them of the migration so that informed decisions could be made regarding its removal. We agree with those authorities concluding that once it becomes known that it is reasonably and medically necessary to remove an IUD, its character changes. Under those circumstances, an IUD is no longer intentionally in the body and the IUD becomes a foreign object. *See Ogle*, 107 Idaho at 876, 693 P.2d at 1078.

[¶19.]    This leaves us with the final question: when does the statute of limitations begin to run in a case involving a foreign object causing a continuing injury? There is no dispute that in April 2006, Schmiedts were informed of the IUD's migration and the need for its removal. There is also no dispute that Schmiedts failed to commence suit within two years of that disclosure. Schmiedts contend that the disclosure is irrelevant because the continuing tort doctrine generally delays the commencement of the statute until the wrong terminates. *See Alberts*, 299 N.W.2d at 455. Schmiedts further contend that the wrong did not terminate until the IUD passed in January 2007.

[¶20.]    In describing the nature of the continuing wrong in *Alberts*, we explained "that the negligence is not the insertion of the [object], but rather the failure to remove [it] when it [is] reasonably and medically necessary to do so, or to

gain plaintiff's informed consent to leave it in [the patient's body]."[3]  299 N.W.2d at 456.  In other words, the continuing wrong is the failure to remove the foreign object or to inform the patient of its existence.  In this case Schmiedts were informed of the foreign object's existence in April 2006. Therefore, the statute of limitations began to run at that time.

[¶21.] A Georgia Court of Appeals decision explained why, in continuing tort cases, the continuing wrong terminates and the statute of limitations begins to run when the foreign object is removed *or* the patient learns of its existence:

> When the doctor placed the steel arterial clamp in the plaintiff's abdomen, he did so with her permission and he therefore did no wrong.  Thus the placing of the arterial clamp was no completed wrong for there was no wrong at all.  When, however, the doctor left the clamp in his patient's abdomen and closed the wound, he commenced a wrong by imposing on the patient's physical being the harboring of a foreign body which could cause her discomfort or pain or be deleterious to her health.  This wrong is not a completed wrong.  This invasion was not transitory but constant.  It is a wrong which continued to be an unlawful invasion of the patient's rights for as long as the clamp remained in its improper place.  Until somehow recognized, this wrong existed in a suspended state of oblivion but exist it did.  In this state of limbo the statute did not run.  As to this type [of] wrong the statute can only begin to run from the time the patient has knowledge, or through the exercise of ordinary care could have learned, of the existence of the continuing tort.

---

3.  For this reason, the circuit court erroneously granted summary judgment on the basis that "the negligence was not the failure to remove the IUD, but rather *[its] placement*." (Emphasis added.)  Although Schmiedts initially pleaded negligent placement, they did not pursue that claim at the summary judgment hearing or on appeal.  Instead, they pursued an *Alberts* claim for failure to disclose or remove a foreign object.  Nevertheless, "[a] trial court may still be upheld if it reached the right result for the wrong reason." *Flugge v. Flugge*, 2004 S.D. 76, ¶ 35, 681 N.W.2d 837, 846 (citing *Sommervold v. Grevlos*, 518 N.W.2d 733, 740 (S.D. 1994)).

*Parker v. Vaughan*, 124 Ga.App. 300, 302, 183 S.E.2d 605, 606 (1971). Other courts, whether applying the continuing tort doctrine under occurrence, discovery, foreign object, or accrual statutes of limitation, also conclude that the statute begins to run no later than when the patient discovers or should have discovered the malpractice.[4]

[¶22.]     In this case, Schmiedts learned of the IUD's migration and the need for its removal in April 2006. At that time, Schmiedts had two years to commence their action.[5] Because they did not, their claim is barred.[6]

---

4.     Courts that apply a discovery rule under occurrence statutes of limitation include: *Agnew v. Larson*, 82 Cal.App.2d 176, 185 P.2d 851 (Dist.Ct.App. 1947); *Puro v. Henry*, 32 Conn.Supp. 118, 342 A.2d 65 (Super.Ct. 1975); *Hepp v. Pierce*, 460 N.E.2d 186 (Ind.Ct.App. 1984); *Spath v. Morrow,* 174 Neb. 38, 43, 115 N.W.2d 581 (1962); *Flanagan v. Mount Eden Gen. Hosp.*, 24 N.Y.2d 427, 248 N.E.2d 871 (1969); *Melendez v. Beal*, 683 S.W.2d 869 (Tex.Ct.App. 1984). Courts that apply a discovery rule under discovery statutes include: *Allen v. A.H. Robins Co., Inc.*, 752 F.2d 1365 (9thCir. 1985); *Bayonne v. Hartford Ins. Co.*, 353 So.2d 1051 (La.Ct.App. 1977). Courts that apply a discovery rule under foreign object statutes include: *Ashworth v. Mem'l Hosp.*, 206 Cal.App.3d 1046, 254 Cal.Rptr. 104 (Dist.Ct.App. 1988); *Cutsinger v. Cullinan,* 72 Ill.App.3d 527, 391 N.E.2d 177 (1979); *Ross v. Kansas City Gen. Hosp. and Med. Ctr.*, 608 S.W.2d 397 (Mo. 1980); *Polichetti v. Cohen*, 702 N.Y.S.2d 85, 268 A.D.2d 417 (App.Div. 2000). Finally, courts that apply a common-law discovery rule under accrual statutes include: *Shillady v. Elliot Cmty. Hosp.*, 114 N.H. 321, 320 A.2d 637 (1974); *Rothman v. Silber*, 83 N.J. Super. 192, 199 A.2d 86 (1964). *See also* 70 A.L.R.3d 7, §§ 5[a], [b] for a collection of cases in which courts have determined that the statute of limitations begins to run when the patient discovers or should have discovered the presence of the foreign object.

5.     Although Anne's pregnancy delayed removal of the IUD until it passed in January 2007, Schmiedts still had over a year to bring a timely claim.

6.     Schmiedts' reliance on *Jumper v. Healthone Corp.*, 699 F.Supp. 220 (D.S.D. 1988) is misplaced. In that case, a drain was placed to drain a wound after surgery. The drain was inadvertently left in the patient, and the occurrence
                                                                    (continued . . .)

#25420

[¶23.]    Affirmed.

[¶24.]    GILBERTSON, Chief Justice, and KONENKAMP, MEIERHENRY, and SEVERSON, Justices, concur.

---

(. . . continued)

statute of limitations had run before the patient discovered the negligence. Like *Alberts*, the district court in *Jumper* concluded: "Any negligence involved was the result not of the placement of the drain, but rather the failure to remove the drain." *Id.* at 222. Although the district court quoted *Alberts* for the proposition that if removal of the foreign object was intended, "it cannot really be said that the treatment is completed until such time as the object is removed," the plaintiff in *Jumper* commenced suit within two years after discovering that removal was necessary. *Id.* at 221.

We also note that, even under discovery statutes of limitation, Schmiedts' interpretation of "when the wrong terminates" is inconsistent with South Dakota law. In *Strassburg v. Citizens State Bank*, 1998 S.D. 72, 581 N.W.2d 510, we observed that discovery of the cause of action precludes delaying the commencement of the statute of limitations until such time as a plaintiff discovers all of his or her injuries. We specifically stated that "[l]imitations periods will not abide indefinitely while those aggrieved discover all their damages." *Id.* ¶ 11, 581 N.W.2d at 515.